Filed 4/18/13

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re JAMES CHARLES STONEROAD, on Habeas Corpus. | A132591 |

James Charles Stoneroad, a life-term inmate of state prison convicted of second degree murder, petitions for a writ of habeas corpus from the decision of the Board of Parole Hearings (the Board) denying him parole. Petitioner argues that the decision denying parole is arbitrary and unsupported by some evidence of his current dangerousness. He additionally urges that the gravity of his commitment offense can no longer be used to find him unsuitable for parole because he has already served more prison time than the maximum base term prescribed by the Board's regulations for that offense.[1]

We reject the latter argument but accept the former. As we explain, the Board's decision does not reflect due consideration of numerous statutory and regulatory factors bearing upon suitability for parole and the evidence the Board relied upon does not rationally indicate petitioner is currently dangerous. Because the decision violates due

---

[1] Petitioner also challenges the Board's decision to schedule his next parole suitability hearing to occur in three years under Penal Code section 3041.5, as amended by California's voters in 2008 via Proposition 9, also referred to as "Marsy's Law." However, on March 4, 2013, his argument that the subsequent hearing deferral provisions in section 3041.5 are constitutionally impermissible ex post facto requirements was rejected by the California Supreme Court (*In re Vicks* (2013) 56 Cal.4th 274), rendering it unnecessary for us to address this issue.

1

process, we shall grant the petition and remand the matter to the Board for further proceedings pursuant to *In re Prather* (2010) 50 Cal.4th 238 (*Prather*).

## BACKGROUND

In 1987, a jury found petitioner guilty of the second degree murder of Michael Kane, the 17-year-old son of petitioner's long-time girlfriend, Mildred Irwin, and of the attempted murder of Irwin. (Pen. Code, §§ 187, 664/187.) He was sentenced to a term of 15 years to life for the murder of Kane and an additional 11-year consecutive term for the attempted murder of Irwin and weapons enhancements. Petitioner entered state prison on July 1, 1987. He became eligible for parole on March 9, 2002, and is currently serving his 26th year in state prison.[2]

In 2006, the Board conducted a subsequent parole suitability hearing and denied petitioner parole. In 2010, the Board again denied petitioner parole and scheduled his next parole hearing to occur in three years. The Board's 2010 rulings are the subject of this petition.

### *Petitioner's Background*

Prior to his imprisonment, petitioner had a long-standing problem with alcohol that is inseparable from any account of his life and the commitment offenses. According to a 1987 probation department report, petitioner began drinking when he was 12 or 13 years old, and was drinking regularly by the time he was 16. Petitioner was a "binge drinker," consuming alcohol until he was extremely intoxicated and sometimes experiencing "blackouts." As we will discuss, petitioner murdered Kane and attempted

---

[2] Penal Code section 669, subdivision (a), provides that where, as in this case, a person is convicted of two or more offenses and sentenced to both determinate and indeterminate terms, and such terms are ordered to run consecutively, the inmate must serve the determinate term before the life sentence commences. (*People v. Grimble* (1981) 116 Cal.App.3d 678, 684, fn. 2.) Petitioner's 11-year determinate term for attempted murder started on July 1, 1987, and was completed, with use of good time credits, on March 9, 1992; the life term commenced on the following day. At the time of the March 4, 2010 parole hearing, petitioner had served 17 years 11 months and 23 days on his life sentence.

to murder Irwin after consuming large amounts of vodka, and has stated through the years since that he has very limited or no memories of these crimes.

Petitioner, a Native American, was born in Pawnee, Oklahoma, in 1946, the seventh of 10 children. He drank in part to relieve a lot of "inner pain" from the emotional and physical abuse he endured as a child. His mother abandoned him when he was a baby and his great-grandmother raised him until he was five, when his mother and father took him back. After this he was "spoiled" and his favored treatment caused resentment among his siblings, particularly his older brother, who repeatedly beat petitioner, and threw him down and choked him until petitioner passed out.

Petitioner dropped out of high school after his sophomore year and left home after a particularly severe altercation with his brother, John. He completed some college courses despite his lack of a high school degree. The probation officer reported that petitioner had falsely claimed in the past to have a Bachelor's and a Master's degree (as well as to be a veteran of the Vietnam War). Petitioner acknowledged to the Board that he had not yet obtained his GED, and the Board noted that he scored a grade placement level of 7.6 on a TABE test, although he had tested higher in the past.

Petitioner was married and divorced twice before the commitment offenses, the marriages resulting in the birth of four children. Both divorces were at least in part due to his continued drinking problems, even though he completed a treatment program during his second marriage. He told the probation officer that his second wife claimed he was abusive towards her, but that he knocked her down only once, when he was sober. A 2001 evaluation reported that petitioner was married a third time in 1991, while he was in prison, but a subsequent evaluation stated that he stopped having contact with this wife in 1996. Petitioner told the Board that he had a "significant other" at the time of the hearing.

Petitioner has no juvenile record and no significant adult criminal record. In 1964, he was convicted of public intoxication and fined $14, and in 1966 he was convicted of being drunk in public and disorderly conduct, for which he was fined $15. In 1972, he was charged with assault with a deadly weapon, but the charge was dismissed due to

3

insufficient evidence. Petitioner told the Board he was sober at the time of the assault incident, which he contended was an act of self-defense against a brother-in-law who had been drinking.

In 1973, petitioner was charged with first degree murder, but found not guilty by reason of self-defense. This incident occurred when he and a group of American Indian Movement members had been drinking and he began to argue with one of the men. The man shot at petitioner and, as he threatened to shoot again, petitioner fired a shot to scare him but accidentally hit him, causing his death.

Irwin met petitioner in 1983 at a residential alcohol treatment program for Native Americans in Oakland. Petitioner was a program resident who later helped establish and operate a youth group for the program. He was employed for about six months in 1984 as the executive director of the Intertribal Friendship House in Oakland. Petitioner had also worked as a marine machinist, a long haul truck driver, and a technical writer, and had done surveying and ranch work.

According to Irwin, she and petitioner began living together in October 1984. Petitioner continued to binge drink during their relationship. He became "mean" when he drank and normally stayed away from home. She said he twice acted violently towards her, both times while under the influence, hitting her the first time and swinging at her the second. The probation officer reported that petitioner left his position at the Intertribal Friendship House to attend an alcohol treatment program "after hitting victim Irwin during an alcoholic blackout." He completed the program, but soon returned to binge drinking.

Irwin said she and petitioner moved to Hoopa in February 1985 so she could work in a high stakes bingo operation. Petitioner found people in Hoopa "very clannish and stand-offish," so he "became more and more isolated and started drinking more."

For some months in 1985, petitioner was also employed at a high stakes bingo operation in Hoopa, but he lost this job when he resumed drinking and ceased working, which left him without income. Petitioner told the Board he was terminated because he left the area to participate in a treatment program; he returned to Hoopa "determined to

4

make a go of it . . . but then after I got back up there, everybody more or less turned away from me again. And I was without employment, in a strange place, isolated, and I started drinking again." A psychiatric evaluator reported at petitioner's 1987 sentencing hearing that, because petitioner was unemployed and financially reliant on Irwin, he became very depressed and began hearing voices taunting and berating him, which caused him to feel angry and fearful.

Irwin told the probation officer that in early 1986 she told petitioner she did not want to "live that way" anymore. Petitioner made plans to move to Montana, where he could find employment. He was packed and ready to leave when Irwin's mother suffered a stroke. Petitioner stayed and he, Irwin, and Kane moved into the mother's home so Irwin could care for her mother. Irwin and petitioner did not address their issues again, and Irwin spent most of her energy dealing with her mother.

### *The Commitment Offenses*

According to accounts in the record, on April 7, 1986, Irwin went to work while petitioner stayed home and drank two and a half pints of vodka between 5:00 p.m. and 7:00 p.m. Kane came home around 8:00 or 8:30 p.m. and eventually went to bed. Irwin returned home at about midnight and found petitioner in a storage room, where he had said he would sleep that night.

About 3:00 a.m., petitioner asked Irwin to come out of her mother's bedroom, but Irwin said she was busy with her mother. Petitioner left and went into a bedroom occupied by Kane. Irwin heard Kane say, "What's the matter with you, no," and she went to investigate. She saw that petitioner was holding a knife and Kane had been stabbed in the chest. The three struggled over the knife, and Irwin's hand was cut badly. Petitioner told Kane, "Your mother is next."

Irwin and Kane broke away from petitioner and ran down the hall. Irwin went to call the police while Kane lay on the floor. Before Irwin could call, petitioner took a rifle out of a cabinet and began loading it. Irwin fought with petitioner over the gun, but petitioner hit her in the head with it; she ran out the back door as petitioner fired a shot at her that missed. Petitioner loaded another rifle and shot Kane, who bled to death.

5

The police found petitioner sleeping in a storage room. He made no attempt to evade arrest and appeared unable to understand why he was being arrested. Petitioner told police he had no memory of the incident because he was extremely intoxicated. A blood sample taken from him at 8:55 a.m. that morning showed a blood-alcohol content of .15. In taped statements to police, petitioner said he could not remember stabbing Kane or shooting at anyone, but that "I must have shot him," that he got along well with Kane and was close to Irwin, and that, "if this is what I did to someone I love, I deserve to be locked up."

Irwin told the probation officer that she was not aware of anything that prompted petitioner's actions. Petitioner had been supportive and helpful about Irwin's mother, and had a "friendly" relationship with Kane.

Petitioner told the probation officer he committed the offenses while under the influence and had only a "fragmented" memory of them at best. The probation officer wrote that reports and evaluations tended to support this claim, suggesting petitioner was unable to exercise his " 'customary social judgment' " and quite possibly did not consciously harbor any ill intent towards Irwin or Kane. He also appeared to be "quite remorseful." Believing he deserved punishment, petitioner declined to appeal his conviction.[3]

### *Petitioner's Prison History*

As respondent acknowledges, petitioner has an exemplary prison history; his only disciplinary citation was for "leaving an unattended hotpot in his cell" in 1990. He was housed in the general population and had a classification score of 19 (indicating a very low security risk) at the time of the hearing. He had paid his restitution in full, he told the Board, to "start living up to the responsibilities" he had.

Along with his self-help programming, which we later describe, petitioner completed vocational training in print technology in December 2009. He worked for

---

[3] Although the record sheds no light on the issue, we assume petitioner admitted killing Kane, and the matters presented at trial were limited to the presence of malice and/or the attempted murder of Irwin.

many years as an institutional clerk and received numerous positive "chronos" [4] regarding his work and programming.

### *Psychological Evaluations*

The record contains several psychological evaluations of petitioner:

### *1987 Sentencing Report*

In 1987, Albert Globus, M.D., a psychiatrist, evaluated petitioner at the request of the sentencing court. His report described petitioner's long history of depression that started in childhood and prior history of amnestic episodes or "blackouts," during which he at times became violent. He experienced such an episode the night of the commitment offenses, which resulted in "almost automatic aggressive behavior" performed "in a rote fashion just as a pianist plays without thinking of each particular note." Petitioner's behaviors were fostered by his chronic and severe depression, delusional experiences at the time, and passive-aggressive personality style. His violent conduct would not have taken place but for his drinking a large quantity of vodka, which blocked his capacity to exercise his customary social judgment.

Concluding that petitioner's delusions were "suggestive of a clinically significant depression," Dr. Globus noted that petitioner' s statements to the police after his arrest were not calculated "to relieve him of responsibility for the crime," but "suggest that he is anxious to accept that responsibility and has concluded that he is responsible, even though he has no specific memory of the shooting. He often states that he is willing to pay the price for his acts and, what is more, he must have done it because no one else was there. This would suggest that he does not have a clear memory of the events even though there is some discrepancy over time in his account of the instant offense. Needless to say, it is difficult for any individual to separate out the actual experience of

---

[4] A "chrono" is an institutional documentation of information about inmates and inmate behavior. (See Cal. Code Regs., title 15, section 3000 [definition of "General Chrono".] All further references to Regulations are to the California Code of Regulations, title 15 [Crime Prevention and Corrections], Division 2 [Board of Prison Terms], section 2000 et seq.)

an event from the subsequent accounts of it.  This is particularly true in someone who was intoxicated or under the effects of an amnestic episode at the time."

*1997 Psychological Evaluation*

A 1997 evaluation by Senior Psychologist Bruce M. Bakeman reported that petitioner was of normal affect and intellectual functioning and appeared to have much better insight and judgment now that he was sober.  Petitioner reported he had no antipathy towards Kane, no memory of the murder, and had been drinking heavily immediately before the commitment offenses.  Dr. Bakeman concluded that, but for his drinking, petitioner would not have committed the offenses, his level of dangerousness was likely to be less than for an average inmate, and that if released "his level of dangerousness is likely to be less now than for the average inmate."  He also recommended that "[c]onditions for parole should include no alcohol."

*2001 Psychological Evaluations*

The 2001 evaluation by clinical psychologist Clif Leonard stated that petitioner functioned normally, "demonstrated considerable insight into himself, and spoke of the last several years in particular as having been quite productive of his understanding of some of the issues involved in his crime, while still recognizing that at heart the crime remains a mystery to him."

Petitioner denied any history of physical abuse as a perpetrator or victim, but acknowledged he was the "butt of some cruelty" from his older brother because of his closeness with his great-grandmother and the extra attention he received from his mother. He referred to his history of drinking and blackouts, completion of "at least five" treatment programs, the amount he thought he drank the day of the commitment offenses, and said alcohol was a "catalyst," but not to blame, for his actions.  He recalled very little about the offenses, had no hostility towards Kane, was "completely baffled" by and had "never made sense" of his "bizarre act," and did not at the time seem concerned with what explanation could be attached to it because that would not diminish the harm he had done or the pain he felt.

8

Petitioner was not then involved with Alcoholics Anonymous (AA), but had been participating in a similar alcohol and drug abuse program targeted at Native Americans sponsored by his Native American church. He was willing to participate in AA as a condition of parole, especially a group sensitive to Native Americans. Based upon petitioner's description of his vocational and other plans if granted release, Dr. Leonard felt petitioner's plans were consistent with his Central file and the nature of "his involvement with people outside the prison while he is in prison" and "seem quite realistic." Dr. Leonard noted that petitioner has no CDC-115 violations, has "programmed successfully in all areas," "has reduced his classification scores to [zero] since 1997," "[h]is Central file is replete with many commendations," and petitioner had no "negative chronos since 1990."

Turning to the crucial question of petitioner's current dangerousness, Dr. Leonard concluded, as did Dr. Bakeman, that, if released, petitioner's "violence potential" would be "no more than that of the average citizen in the community, or perhaps even a little bit less, so long as he remains sober and involved in supportive relationships of the sort he reports having an abundance of now." Dr. Leonard also felt the Native American drug program in which petitioner was then participating was "the functional equivalent for him of involvement with Alcoholics Anonymous for a non-Native American," an opinion supported by other evidence.[5] The evaluator recommended mandatory post release participation in both programs.

---

[5] A 2009 chrono from a correctional officer who served as "staff liaison" to the Native American Spiritual Circle documents petitioner's active participation in the program and its efficacy. The chrono states that "the practice of sobriety through abstinence from drugs and/or alcohol is of profound significance, meaning [and] importance." "[E]duction, song, storytelling, and tribal practices," which the Spiritual Circle fostered, "equate to a daily *way of life* for the participants as it is for all American Indians. This program (and some others focusing on American Indians) "are equal to or exceed the expectations of the twelve steps of Alcoholics Anonymous and Narcotics Anonymous Recovery Groups, as participants must not only abstain from alcohol and controlled substances on a daily basis for individual growth and development, but also, they must be alcohol and drug free to participate in the Inipi (Sweatlodge) ceremony for spiritual purposes."

A Life Prisoner Evaluation Report of petitioner by correctional staff also prepared in 2001 made a similar assessment: "Stoneroad's propensity for criminal behavior occurs only when he is drinking alcohol. In that sense, Stoneroad obviously poses a degree of threat and potential for acting out. However, if one considers Inmate Stoneroad's obvious insight into how his crime came about, his recognition of the low self-esteem and inner turmoil he now has faced, and his acceptance of his need to continue to strengthen his coping skills, Stoneroad would pose a low degree of threat if released. Stoneroad could probably deal with the stressors of employment, residence and so forth. Stoneroad would be more capable of this given a date further in the future." The 2001 Life Prisoner Evaluation also noted petitioner's "quite frank" observation that he was not then ready for parole. "He stated that, naturally as a lifer inmate, he would want his freedom. But logically speaking, he feels that he is not yet finished with his spiritual development. He recognizes that he has just recently come into who he truly is." Noting that petitioner had long participated in Native American sweat lodge ceremonies, the report expressed the belief that "his involvement in his culture has greatly benefitted the inmate." The report also stated that petitioner "expressed genuine remorse," has "shown humility and yet has also shown promise in the 'reclamation of hope.' "

*2009 Psychological Evaluation*

The 15-page Comprehensive Risk Assessment prepared in 2009 by forensic psychologist Richard Hayward is consistent with the earlier reports of Drs. Bakeman and Leonard and the 2001 Life Prisoner Evaluation. Petitioner "acknowledged responsibility for the offense and expressed remorse following his arrest and throughout his incarceration." Petitioner knew "his actions were devastating to the family and the local community" and "added that he never appealed his case because he felt that he belonged in prison." With respect to petitioner's ability to refrain from future use of alcohol in the free community, Dr. Hayward observed that petitioner started participating in AA in 2006, but had been participating in the Native American Spiritual Circle, which also addresses substance abuse, since 1995. Petitioner acknowledged his drinking problems and was familiar with the 12 steps, which he described as "similar to the Native

10

American steps for following the spiritual path in life." He described how he has incorporated these spiritual steps into his daily life and how they have improved his relationships with other people."

Noting that petitioner "displayed seriously impaired impulse control at the time of the commitment offense," Dr. Hayward saw no signs "indicating impairment of impulse control or judgment" at the present time. He also felt that, "during his incarceration, Mr. Stoneroad has gained insight into several of the factors that contributed to the offense, including his severe abuse of alcohol." Although petitioner had somewhat less insight into the reasons for his rage at the time of the offense, he is aware of his inability "to resolve or verbally communicate the anger that he felt as a result of abandonment by his mother and the abuse from his older brother" and "aware that he typically suppressed his anger but occasionally released it in a rage when he was severely intoxicated." Dr. Hayward felt petitioner "currently displays an improved ability to communicate his feelings."

Addressing petitioner's current dangerousness, Dr. Hayward noted that (1) petitioner's total scores under the three scientific risk assessment methods used to measure the danger he would present if released[6] all place him in the "low range" of risk, (2) petitioner "has displayed evidence of increasing maturity and improved impulse control," and communicated no "indication of antisocial thinking," and (3) "has achieved additional insight into the contributing factors to his commitment offense." Primarily for these reasons, Dr. Hayward opined that, overall "Mr. Stoneroad presents a low risk for violence in the free community."

### Petitioner's Testimony at the Parole Hearing

At the 2010 Board hearing, petitioner said he could not remember what had happened on the night of the commitment offenses, but agreed he had committed "a pretty horrific crime." He had struggled with this issue ever since he entered prison

---

[6] Namely, the Psychopathology Check List-Revised (PCL-R), the Historical-Clinical-Risk Management-20 (HCR-20), and the Level of Service/Case Management Inventory (LS/CMI).

11

because there was no reason for it, and the only thing he could understand was that for years he had "hidden so much anger and rage inside of myself that only came out when I was using alcohol." Petitioner discussed his childhood abuse, and said he only learned about it when he "started looking at it seriously about eight years ago."

Asked why his anger and rage manifested itself towards Kane and Irwin, petitioner said he had "no reason to be angry" with them; his anger was unobjectified; "it could have been anybody. I don't think it was specific people. I think that it could have been anybody at that time that was close to me or near me, because the anger, the rage that, when it was first brought to me or given to me by the beatings that my brother gave me, it was done by somebody who was supposed to have been close to me, supposed to have been my brother."

Acknowledging a long history of alcoholism and binge drinking, petitioner eventually came to see that although alcoholism was the "catalyst" of his crime, it was not the root cause. His need to understand why he murdered his stepson, with whom he had a close and loving relationship, led him to examine the circumstances that drove him to drink in the first place. The first step in reaching this understanding, he explained, was moving beyond denial of the problem. Petitioner came to see that alcohol relieved his "inner pain" and "confusion." His testimony, too extensive to fully relate here, is illustrated by the following statement, which responded to the query "what was the inner pain caused by?"

"This is something that I've struggled with all my life . . . . I discussed it before with the probation officer and with the psychiatrists that I've seen, but never in depth, never to a point of how much it actually impacted me, never to the point of how much it really bothered me. And the fact of the matter is, is that when I was born, and this was unknown to me at the time, but I was abandoned by a river by my mother, who, I understand now, was suffering from postpartum depression. And she had somebody put me by the river, and apparently for the animals to have, you know. So, but my grandmother, she felt something was wrong, and she had my uncle go look for me, and he found me . . . and took me home to my great grandmother, with whom I stayed

12

with . . . until I was about five years old [when] . . . I was taken from that home by basically strangers that I had never met before, who were my mother and father."

When he arrived at his parents' home "there were numerous siblings there that I didn't know. They were strangers to me also." Unaccountably, his mother treated him better than the others "which set me up as a target for the other kids." His oldest brother, who was twice his age, "became very abusive to me, where he would beat me and he would throw me down and choke me till I passed out . . . . [T]hese are the kinds of things that I've carried throughout my life. I understand what it is to be helpless, and not be able to do something against somebody that's stronger than you, and the rage that it builds within you. . . . [A]nd I understand also that I never did really find any kind of satisfactory outlet for that, either through therapy or through talking . . . . And I know that this is the type of rage that always came out whenever my inhibitions were lowered." While living with his parents, his great grandmother, "who was a wealthy woman, . . . would give my parents money in order to keep me. . . . [M]y older brother was aware of this, and that was even more incentive for him to abuse me."

Asked "what are your alcohol triggers?" petitioner identified "[d]epression, feelings of low self-esteem, rejection, and I guess that deep sense of abandonment that I initially felt." Petitioner acknowledged he gained this insight "only when I started looking at it seriously about eight years ago. Up until that time, I was in denial, kind of numb. If you will."

One of the key insights petitioner attributed to the counseling and therapy he received in prison was the manner in which the "anger and rage inside of myself . . . only came out when I was using alcohol." "It's not that I'm putting the blame on someone else," he said, "because I did all these things. But I think alcohol was the catalyst as to why I did them, because it took away the pain for however brief a time that I had it." Petitioner noted "[t]he rage, the anger that was never resolved, and the fact that I always look for an easy way out in terms of drinking, instead of facing up to the pain that I was carrying." When asked what reason this provided for anger at his stepson, petitioner reiterated that his rage was at the world, not his stepson.

13

Asked how he "resolved" the issues and arrived at this understanding, petitioner stated that the main way was "by being aware of them, basically." After petitioner admitted he still had some of the feelings of rejection that had led him to alcoholism in the past, and was asked how he would deal with it on the outside, petitioner stated, "I would seek counseling and therapy, because I think that a lot of these issues that I carry can only be dealt with through therapy."

Reminded that he had been in counseling and therapy before he committed his offense, petitioner explained that he was then still in denial, and not genuinely committed to the therapy he was then receiving. He accepted counseling at that time, he said, simply to get people "off my back." Asked to explain why the Board should believe he was committed to the post conviction counseling and therapy he credited with ultimately opening his eyes, and would remain committed to it if released from prison, petitioner noted that, though he had not had a single drink during the nearly a quarter of a century he had been imprisoned (though "pruno" is readily available), he had not only openly admitted his alcoholism for many years, but independently reached out to organizations and counselors capable of helping him deal with it.

Petitioner credited several self -help groups he believed had been particularly helpful, naming Alternatives to Violence, the Victims/Offenders Education Group, the Native American Spiritual Circle and Alcoholics Anonymous. The panel asked petitioner to indicate the benefits he received from each of these programs, and his answers were lengthy, articulate, and thoughtful.

Among other things, Alternative to Violence helped him see that there are "viable alternatives to just about any situation you find yourself in, whether it's backing down, reasoning with somebody, or trying to see their viewpoint, rather than trying to push your own viewpoint on somebody. There are always ways to deal with an aggressive person. Or even if you yourself become aggressive, there are ways to put yourself in check, and this is something that I learned a lot [about] from them."

Asked to identify the single most important thing he learned about himself from the Victims/Offender Education Group, petitioner said it was the ability to examine "why

14

I carried so much anger and rage." This was accomplished, he explained, in group settings in which eight men were encouraged to probe deeply into matters they had become skilled at repressing. "[W]e were always crying in there," he said, "because . . . these are things that people don't talk about usually, . . . especially men in prison, . . . and it was a very, I must say, enlightening program for me." Petitioner also learned from this program that "the inhibitions we have prevent us from doing certain things or to act in certain ways, and I learned that there are also disinhibitors that you might say enhance the possibility of relapsing." Certain things triggered such disinhibitions. Petitioner described certain things—such as "isolation, . . . depression, . . . anger, and . . . sense of loss," as "emotional triggers," and others— such as situations where one is "associat[ing] with old drinking buddies or frequent[ing] places where they sell liquor or beer" —as "social triggers." "With every disinhibitor there's also a challenge," petitioner explained, so that it is necessary to learn to "to think [and] rethink clearly what's going on," and, most importantly remind yourself "that it's your responsibility. Nobody else's but yours." Petitioner stated that "I understand now that there have always been underlying issues that alcohol seemed to trigger, seemed to act as a catalyst for certain behaviors that I exhibited. It allowed the anger to come out, the rage, and memories, I guess." But "I've finally gotten honest with myself," petitioner stated, "and beg[u]n to actually realize what it all means. Before I more or less took it for granted. And it's like growing up, finally understanding, finally becoming aware of things I wasn't aware of before, or I refused to be aware of."

After further discussion of the foregoing programs, petitioner was asked about the Native American Spiritual Circle. He described the program's philosophy as based on four "directions," the first and most crucial one being the direction "of introspection, where you journey inside yourself, [t]o find that which has been hidden for so long within you. And what that leads to is a sense of spirituality, a sense of individuality, and that will eventually lead to awareness of who you are, and what you are, and what you're all about." The group taught that there was a red and a black road to recovery: The red road is normally viewed as positive but can sometimes be bad, and sometimes a black road can

15

be good.  "And what that means is that not everything is always what it seems.  That something that looks good maybe can be bad, so this is something that we have to look at, you know, very closely at."  Asked whether he saw "any complications or contradictions between your cultural road to recovery and what we usually see as a compliance with Alcoholics Anonymous," petitioner said he did not.  "In fact," he explained, "it's very much the same thing," using as examples the emphasis both programs place on introspection and the fact that both have a spiritual aspect.

When the presiding commissioner said, you "faced your demons and now you're fine with it?" petitioner answered "No," because "no alcoholic could say that."  Asked what he would do if after he was released his family and friends "have a big party where alcohol is served.  Somebody comes up to you, [says] [c]ome on, let's just have a drink. . . .  How are you going to deal with that?"  Petitioner answered:  "I wouldn't be there, first of all, because I would keep myself away from that kind of activity,  because I know what alcohol does to me . . . to me it's like a poison, and I can't kid myself about it.  It's something that I can't play with anymore."  Petitioner spent considerable time on this issue, expressing his deep determination to cease "engaging in the same types of risky behaviors that I did before, and lying to myself, rationalizing, testing myself, and believing . . . or trying to convince myself that I was all right and that I can indulge, when I know damn well that I can't."   Aware his drinking problem could return at any time if he allowed it, petitioner emphasized he had for years endeavored to understand his problem, and had been dealing with it on a daily basis.

***Petitioner's Parole Plans***

Accepting the legitimacy of the Board's expressed concern that, though he had been sober for 25 years, he could still fall back into his old habit, petitioner described in some detail his "relapse prevention plan," which he said addressed "the challenge of high risk situations" and pertinent "disinhibitors for relapse."  The Sierra Tribal Consortium (STC), a state certified "live-in program" providing alcohol and other drug abuse treatment and recovery services to the American Indian population in California's central valley, was a key element of petitioner's plan.  STC had been in contact with petitioner,

16

accepted him as a participant if he was paroled, and agreed to regularly monitor his sobriety and compliance with related commitments for at least a year. Petitioner's tribe, which was apparently also involved in the development of petitioner's plan, had agreed to pay STC for these services.

For the first three months of the residential program, STC would provide petitioner "intense treatment, Alcoholic Anonymous and group therapy." This would be followed by a nine-month "live-in program" during which he could pursue employment opportunities and further education and job training. Reflecting his understanding of the importance of maintaining abstinence during the crucial first year of transition to free society, participating in the highly structured environment STC offered was the "main thing" petitioner was focused on in planning for parole. After graduating from the residential phase of the program, petitioner planned to move into nearby housing owned by his "significant other," who had long supported petitioner's efforts to accept and confront his alcoholism. Petitioner expressed confidence that his certification as an offset printer would enable him to obtain employment after he completed the STC program. Petitioner agreed to a no alcohol condition of parole and regular monitoring of his conduct by a parole officer.

### The Board's Denial of Parole

Acknowledging petitioner's many positive achievements, including his work to date in AA, his payment in full of restitution, his forthrightness with the Board, his discipline-free time in prison, his efforts to be assigned to, and complete, a vocational program, and his participation in a variety of groups and cultural involvement, the Board denied him parole due to the heinousness of the life crime, his lack of insight into why he committed it, a related concern with his accounting of the events that led up to the incident, and his limited working through the steps of AA. The Board scheduled petitioner's next parole hearing to occur in three years because it was "the lowest that we can give."

Petitioner filed a petition for a writ of habeas corpus in Humboldt County Superior Court challenging the Board's denial. In a very brief and conclusionary order, Superior

17

Court Judge Marilyn B. Miles denied the petition, finding the Board's denial was supported by petitioner's lack of insight into what caused him to commit the crime, his unstable social history, his failure to adequately address his alcohol abuse issues, and his inadequate parole plans.[7]

## DISCUSSION

### I. General Legal Standards

The Board's parole authority is governed by a body of statutes and regulations as mandated by the Legislature, most notably Penal Code section 3041 (section 3041) and title 15, section 2402, of the California Code of Regulations. " 'Subdivision (b) of section 3041 provides that a release date must be set "unless [the Board] determines that the gravity of the current convicted offense or offenses, or the timing and gravity of the current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual," and mandates that the Board "normally " set a parole date for an eligible inmate, and must do so unless it determines than an inmate poses a current threat to public safety.' " (*Prather, supra,* 50 Cal.4th at p. 249, quoting *In re Lawrence* (2008) 44 Cal.4th 1181, 1202 (*Lawrence*).) As a result, parole applicants have a "due process liberty interest in parole" and "an expectation that they will be granted parole unless the Board finds, in the exercise of its discretion, that they are unsuitable for parole in light of the circumstances specified by statute and by regulation." (*Lawrence,* at pp. 1191, 1204, quoting *In re Rosenkrantz* (2002) 29 Cal.4th 616, 654, 666 (*Rosenkrantz*).)

In *Lawrence* and *In re Shaputis* (2008) 44 Cal.4th 1241 (*Shaputis I*), which reaffirmed the availability of judicial review of suitability determinations rendered by the Board and the Governor, our Supreme Court "resolved a conflict among the appellate courts regarding the proper scope of the deferential 'some evidence' standard of review [it] set forth in *Rosenkrantz, supra,* 29 Cal.4th 616 and thereafter applied in *In re Dannenberg* (2008) 34 Cal.4th 1061 [(Dannenberg)]." (*Prather, supra,* 50 Cal.4th at

---

[7] The trial court noted that because appointed counsel filed no denial or traverse to respondent's return, "the allegations of the return are deemed admitted."

p. 251.) *Lawrence* and *Shaputis I* "clarified that in evaluating a parole-suitability determination by either the Board or the Governor, a reviewing court focuses upon 'some evidence' supporting the core statutory determination that a prisoner remains a current threat to public safety—not merely 'some evidence' supporting the Board's or the Governor's characterization of facts contained in the record." (*Prather*, at pp. 251-252.)

More recently, in *In re Shaputis* (2011) 53 Cal.4th 192 (*Shaputis II*), the Supreme Court addressed the question whether consideration of an inmate's "lack of insight" is within the scope of Board regulations and may be employed as a factor indicative an inmate is unsuitable for release on parole. Finding it is "well within the scope of the parole regulations," the court stated that although the regulations do not use the term "insight," "they direct the Board to consider the inmate's 'past and present attitude toward the crime [citation] and 'the presence of remorse,' expressly including indications that the inmate 'understands the nature and magnitude of the offense.' [Citation.]" (*Id*. at p. 218). In the court's view, "[t]hese factors fit comfortably within the descriptive category of 'insight.' " (*Ibid*.)

In making this determination, and in other respects, the *Shaputis II* court undertook to "reaffirm the deferential character of the 'some evidence' standard for reviewing parole suitability determinations." (*Shaputis II, supra*, 53 Cal.4th at p. 198.) The opinion emphasizes that the appellate court must uphold the decision of the Board or the Governor "unless it is arbitrary or procedurally flawed," and it "reviews the entire record to determine whether a modicum of evidence supports the parole suitability determination." (*Id*. at p. 221.) "The reviewing court does not ask whether the inmate is currently dangerous. That question is reserved for the executive branch. Rather, the court considers whether there is a rational nexus between the evidence and the ultimate determination of current dangerousness. The court is not empowered to reweigh the evidence." (*Ibid*.) At the same time, adverting to language in *Rosenkrantz*, *Lawrence* and *Shaputis I*, *Shaputis II* also reiterates and reaffirms the established principle that the Board's decision must "reflect[] due consideration of the specified factors as applied to the individual prisoner in accordance with applicable legal standards." (*Shaputis II*, at

19

p. 210, citing *Rosenkrantz, supra,* 29 Cal.4th at p. 677; *Lawrence, supra,* 44 Cal.4th at p. 1204, and *Shaputis I, supra*, 44 Cal.4th at pp. 1260-1261.)

The line of Supreme Court opinions commencing with *Rosenkrantz, supra*, 29 Cal.4th 616 and culminating in *Shaputis II, supra,* 53 Cal.4th 192, thus requires us to affirm a denial of parole unless the Board decision does not reflect due consideration of all relevant statutory and regulatory factors or is not supported by a modicum of evidence in the record rationally indicative of current dangerousness, not mere guesswork.[8]

We have reviewed the record and the Board's decision with the foregoing legal standards in mind. However, before explaining the Board's failure to consider the statutory and regulatory factors indicating petitioner is suitable for parole, and why the evidence it relied upon instead is not rationally indicative of his current dangerousness, we first address petitioner's contention that the Board is at this time foreclosed from relying in any way on the gravity of his commitment offense.

## II.  The Board is Not Foreclosed From Relying, in Part, on the Gravity of Petitioner's Commitment Offense

The gravity of the commitment offense is one of the factors relevant to a determination of suitability for parole insofar as it suggests a current threat to public safety. (Regs., § 2402; *Lawrence, supra*, 44 Cal.4th at p. 1214.) Petitioner's argument arises from the fact that the gravity of the commitment offense also relates to the very different determination of an inmate's "base term," or "base period of confinement." (*In re Stanley* (1976) 54 Cal.App.3d 1030, 1039.) The base term is determined "solely on the gravity of the base crime," pursuant to biaxial matrices set forth in the regulations that provide a triad of terms for a given offense depending on the circumstances in which it was committed. (Regs., § 2403.) One axis of the matrix relates to the manner in which the offense was carried out, the other to the relationship between the prisoner and his or her victim. The regulations call for the base term to be set only if and when an inmate is

---

[8] We do not share our dissenting colleague's apparent belief that *Shaputis II* somehow casts doubt on the continuing force of the due process considerations assayed in *Lawrence* (see dis. opn. of Haerle, J., at p. 5, fn. 3), which his opinion largely overlooks.

20

found suitable for release on parole.  (Regs., § 2403, subd. (a) ["The panel shall set a base term for each life prisoner who is found suitable for parole"].)

Unlike the parole suitability determination, which focuses on whether the inmate is *currently* dangerous and is governed by his or her postconviction behavior, the setting of the base term is designed to insure life prisoners do not serve terms disproportionate to the culpability of the individual offender.  The proportionality of a sentence turns entirely on the culpability of the offender as measured by "circumstances existing *at the time of the offense*."  (*In re Rodriguez* (1975) 14 Cal.3d 639, 652 (*Rodriguez*), italics added.)  The specific criminal acts proscribed by the Penal Code ordinarily "prohibit[] a wide range of culpable conduct, with a correspondingly wide range of punishment."[9]  (*People v. Wingo* (1975) 14 Cal.3d 169, 176 (*Wingo*).)  "[N]o prisoner can be held for a period

_____

[9] For example, the nine triads of sentences prescribed by the matrix of base terms applicable to petitioner's base offense, second degree murder, range from 15-16-17 years to 19-20-21.  (Regs., § 2403, subd. (c),)  The most mitigated applies when (1) the "[v]ictim dies of causes related to the act of the prisoner but was not directly assaulted by prisoner with deadly force; e.g., shock producing heart attack, a crime partner actually did the killing" and (2) the "[v]ictim was accomplice or otherwise implicated in a criminal act with the prisoner during which or as a result of which the death occurred, e.g., crime partner, drug dealer, etc."  (*Ibid.*)  The most aggravated triad applies where (1) "[d]eath resulted from severe trauma inflicted with deadly intensity; e.g., beating, clubbing, stabbing, strangulation, suffocation, burning, multiple wounds inflicted with weapon not resulting in immediate death or actions calculated to induce terror in the victim," and (2) the "[v]ictim had little or no personal relationship with prisoner *or* motivation for act resulting in death was related to the accomplishment of another crime, e.g., death of victim during robbery, rape, or other felony."  (*Ibid.*)  Board regulations also identify 20 aggravating circumstances warranting imposition of the upper term specified in the applicable base term triad, and 10 mitigating circumstances warranting imposition of the lower term.  (Regs., §§ 2404, subd. (a)(1)-(20), 2405, subd. (a)(1)-(10.).)  Thus, as examples, the upper term may be used where "[t]he murder was committed to preclude testimony of potential or actual witnesses during a trial or criminal investigation" or "[t]he corpse was abused, mutilated, or defiled," or the murder was "committed to prevent discovery of another crime."  (Regs., § 2403,subd. (a)(4), (9), (11)); and the lower term may by employed where "[t]he prisoner participated in the crime under partially excusable circumstances which do not amount to a legal defense," or he or she "has a minimal or no history of criminal behavior," or she "suffered from Battered Women's Syndrome . . . and it appears the criminal behavior was the result of that victimization.  (Regs., § 2405, subd.  (a)(2), (8), (9).)

21

grossly disproportionate to his or her individual culpability for the commitment offense."
(*Dannenberg, supra,* 34 Cal.4th at p. 1096.) Because excessive punishment violates the
cruel and unusual punishment clause (article I, § 17) of the California Constitution, an
inmate cannot be retained in prison beyond the constitutional maximum period of
confinement. (*Ibid.*)

Since petitioner has never been found suitable for release, his base term has never
been set. According to petitioner, however, the prison time he had served at the time of
the 2010 parole hearing, reduced by good time credits he had earned (Regs., § 2410),
exceeded the maximum base term applicable to his offenses, which he believes to be
19 years at most.[10] Even if good-conduct credit is not considered to reduce the base term,
petitioner argues, at the time of his next parole hearing he will have served 20 years
11 months and four days in prison on his life sentence—which commenced on March 10,
1992, about five years after he entered prison—which is "well beyond the maximum
unadjusted base term of 19 years and exceeds even a 20-year base term" were the Board
to find the aggravated term applicable. In short, suggesting he has already or will soon
have served a term disproportionate to his culpability based upon the Board's own
criteria of culpability, petitioner maintains "it is neither reasonable nor legally
permissible" for the Board to rely on the gravity of his commitment offense as a basis
upon which to find him unsuitable for release.

As we have said, the Board does not fix an inmate's base term until he or she is
found suitable for release on parole despite the fact that the Board knows at the time the
inmate enters prison the nature and circumstances of the commitment offense, which is
all it needs to know to fix the base term. This failure to promptly fix the base term may

---

[10] According to petitioner, because he had a prior relationship with the victim and
his offense did not involve specified aggravating factors, the base term matrix for his
offense would call for a maximum base term of 19 years. (Regs., § 2403, subd. (c).)
Petitioner calculates that he began to serve his life sentence on March 10, 1992, after
completion of his determinate term, and at the time of the March 4, 2010, parole hearing,
had served 17 years 11 months and 23 days of the life sentence. Accounting for good-
conduct credits, petitioner calculates that at the time of the 2010 hearing he had exceeded
the 19-year base term by five years.

well be constitutionally problematic. As Justice Mosk explained in *Wingo, supra,* 14 Cal.3d 169, "a sentence may be unconstitutionally excessive either because the [parole authority] has fixed a term disproportionate to the offense or, in some circumstances, *because no term whatever has been set. A failure to fix his term may be just as violative of a defendant's right as an actual excessive term . . . .*" (*Id.* at pp. 182-183**.**) The potential for prison terms disproportionate to individual culpability led the court in *Rodriguez* (construing the indeterminate sentencing law then in effect) to order the Board to set maximum terms promptly upon inmates' entry into prison. (*Rodriguez, supra,* 14 Cal.3d at p. 654, fn. 18.)

*Rodriguez* was concerned both with the potential for this kind of disproportionality and the difficulty of obtaining judicial review when disproportionality was alleged to occur. Shortly before *Rodriguez*, the Supreme Court had concluded in *Wingo, supra,* 14 Cal.3d 169, that "when an inmate convicted under a section encompassing a wide range of conduct challenges the statute as imposing cruel and unusual punishment, judicial review must await an initial determination by the Adult Authority of the proper term in the individual case. When a term is fixed a court can then analyze the constitutionality of the statute as applied. If the Authority, either by omission or by the exercise of its discretion, fails or declines within a reasonable time to set a term, the particular conduct will be measured against the statutory maximum." (*Wingo*, at p. 183.)

*Rodriguez* stated: "For purposes of assessing the constitutional proportionality of an inmate's term, the court will deem it to have been fixed at the maximum if the Authority does not act promptly to fix the primary term of a prisoner committed to the Department of Corrections to serve an indeterminate sentence. ([*Wingo*]*, supra,* 14 Cal.3d at p. 183.) Since newly committed inmates undergo an initial period of observation and classification, and, the Authority has recently announced its intent to set tentative release dates and fix terms for most prisoners shortly after they are received, prompt fixing of the primary term will not add an extra administrative burden." (*Rodriguez, supra,* 14 Cal.3d at p. 654, fn. 18.) The *Rodriguez* court felt prompt term fixing necessary not only to "prevent the intrusion of irrelevant, post-conviction factors

23

into the determination of punishment that is proportionate to the offense of the particular inmate," but also make possible the type of meaningful review of Authority actions to which prisoners are entitled," citing the problem indicated in *Wingo*. (*Ibid.*) "Were unrepresented prisoners required to take the initiative by seeking relief at such time as they believed their continued imprisonment to be constitutionally impermissible, not only might abuses such as that in the instant case and that in [*In re Lynch* (1972) 8 Cal.3d 410] recur, but courts would continue, as now, to receive inadequate petitions unaccompanied by necessary supporting data. Since prison inmates understandably lack perspective as to the propriety of their continued incarceration, and also lack the ability to marshal facts and applicable law in support of their claims, it is probable that courts will be burdened by a flood of meritless petitions. . . . Once the primary term is fixed by the Authority, however, all of the relevant data regarding the particular inmate, the circumstances of his offense, and the criteria upon which the term is based will have been marshaled by the Authority, thus enabling the petitioner to set out the basis or bases for his complaint, while at the same time providing the court with a record adequate to permit meaningful review." (*Rodriguez, supra*, 14 Cal.3d at p. 654, fn. 18.)

While *Dannenberg* subsequently relieved the Board of the duty to determine the base term before determining suitability, it did so in the context of addressing a very different question: whether, under the Determinate Sentence Law, the policy of uniformity in sentencing transcended the interest in protecting public safety. *Dannenberg* concluded "[t]hat the statutory scheme, viewed as a whole, clearly elevates a life prisoner's individual suitability for parole above the inmate's expectancy in early setting of a fixed and 'uniform' parole date." (*Dannenberg, supra*, 34 Cal.4th at pp. 1070-1071.) For this and other reasons, the *Dannenberg* court rejected the idea that constitutional considerations impose upon the Board an obligation to fix a base term tailored to individual culpability for indeterminate life inmates before determining suitability for parole. (*Id.* at p. 1096.) However, relying upon *Rodriguez* and *Wingo, Dannenberg* acknowledged that section 3041, which partially combined the term and parole functions *Rodriguez* required to be performed separately, "cannot authorize retention of a life

24

prisoner eligible for parole, *even for reasons of public safety*, beyond the constitutional maximum period of confinement." (*Ibid.*, italics added.) The *Dannenberg* court was not called upon to explain how, under the procedure it authorized, an inmate not found suitable for release who claims he has been held beyond the constitutionally permissible period can overcome the obstructions to judicial review the *Rodriguez* court sought to eliminate.

These problems may reappear in the wake of *Dannenberg,* but they are not presented in the case before us. Unlike the petitioners in *Rodriguez* and *Dannenberg*, petitioner here makes no claim that delaying term-fixing until an inmate is found suitable for release fails to comport with the constitutional demands of the Eighth Amendment and article I, section 17, of the California Constitution or obstructs judicial review of an assertedly disproportionate sentence, claims which could not be sustained without factual showings not made in this case. (See also *In re Morganti* (2012) 204 Cal.App.4th 904, 943, conc. & dis. opn. of Kline, P.J.) Instead, in the context of a challenge to an unsuitability determination, he claims only that once an inmate has served his or her maximum base term, the gravity of the commitment offense cannot be used as a basis upon which to deny parole.[11]

We do not perceive the problem petitioner asks us to solve.

Prior to *Lawrence, supra*, 44 Cal.4th 1181, the denial of parole was nearly always predicated on a characterization of the commitment offense as particularly egregious. (*Id*. at p. 1219.) *Lawrence,* however, has significantly diminished the significance the Board can attach to this factor, and limited its use. As *Lawrence* points out, "there are few, if any murders that could *not* be characterized as either particularly aggravated, or as

---

[11] Nor did petitioner raise this issue before the Board, although that omission may be understandable. An inmate seeking a release date may well feel that challenging Board policies and practices would jeopardize that overarching goal. It is also questionable whether lifers' attorneys, who are appointed by the Board and paid $50 per hour for a maximum of 8 hours (Board of Parole Hearings, *Lifer Attorney Packet* (http://www.cdcr.ca.gov/BOPH/docs/ATTY_PACKET2010.pdf) possess the resources to mount such a challenge to procedures promulgated by the government agency that appoints them.

25

involving some act beyond the minimum required for conviction of the offense," though "the aggravated nature of the commitment offense does not, in every case, provide some evidence that the inmate remains a current threat to public safety." (*Id*. at p. 1218.) Moreover, the commitment offense is an immutable factor that would almost always mandate upholding the denial of parole. Furthermore, after a period of time the commitment offense loses much of its usefulness in predicting the likelihood of future offenses. (*Id*. at pp. 1218-1219.) "At some point," *Lawrence* reasons, "when there is affirmative evidence, based upon the prisoner's subsequent behavior and current mental state, that the prisoner, if released, would not currently be dangerous, his or her past offense may no longer realistically constitute a reliable or accurate indicator of the prisoner's current dangerousness." (*Id*. at p. 1219.) The result of *Lawrence* and its progeny is that the aggravating nature of a crime can no longer provide evidence of current dangerousness "unless there is also evidence that there is something about the commitment offense which suggests the inmate still presents a threat to public safety." (*In re Denham* (2012) 211 Cal.App.4th 702, 715, citing *Lawrence,* at p. 1214.) Therefore, the gravity of the commitment offense can no longer, in and of itself, justify denial of parole.

The decision of the Board in this case does not indicate otherwise. Although prefatory language in the panel's decision declares that "the commitment offense is terribly atrocious, heinous, it's cruel," the routine incantation of this regulatory factor (Regs., § 2402, subd. (c )(1) ["The prisoner committed the offense in an especially heinous, atrocious or cruel manner"] is relatively meaningless. The decision denying petitioner parole stands or falls on the propriety of the panel's concomitant finding that, due to lack of insight into the causes of his crime, petitioner remains currently dangerous. As we now explain, the decision cannot be sustained, because it ignores numerous relevant factors it is required to consider and the evidence it instead relies upon is not rationally indicative of current dangerousness.

26

### III. The Board's Decision and Reasoning Ignore Relevant Statutory and Regulatory Factors Bearing Upon Suitability for Release on Parole

Even before factors relevant to parole decisions were prescribed by statute and regulation, our Supreme Court had concluded "that '[a]ny official or board vested with discretion is under an obligation to consider *all* relevant factors [citation], and the [Board] cannot, consistently with its obligation, ignore postconviction factors unless directed to do so by the Legislature.' (*In re Minnis* (1972) 7 Cal.3d 639, 645.) 'Although a prisoner is not entitled to have his term fixed at less than maximum or to receive parole, he is entitled to have his application for these benefits "duly considered" ' based upon an individualized consideration of all relevant factors. (*Id*. at p. 646; see also *In re Ramirez* (2001) 94 Cal.App.4th 549, 569-572.)" (*Rosenkrantz, supra,* 29 Cal.4th 616, 655.) As recently reiterated in *Shaputis II, supra*, 53 Cal.4th 192, the Board's decision must reflect " 'due consideration' " of the specified statutory and regulatory factors. (*Id.* at p. 210.)

The Board's "Decision"[12] in this case clearly does not do so. It ignores not just "several" factors indicative of suitability for release set forth in its own regulations (Regs., § 2402, subd. (d)), *but virtually all of them*. The *sole* regulatory factor bearing on suitability mentioned in the Board's Decision is the gravity of the commitment offense, which we have separately discussed. The Decision ignores the same factors disregarded

---

[12] Whether or not as a matter of due process the Board is required "to 'comprehensively marshall the evidentiary support for its reasons' " (*In re Sturm* (1974) 11 Cal.3d 258, 272; see *Shaputis II, supra*, 53 Cal.4th at p. 214, fn. 11), meaningful judicial review requires, at a minimum, that the Board identify the evidence it relied upon and its reasoning. The Board accepts this responsibility. Its regulations affirmatively acknowledge the duty to provide every prisoner a "verbatim transcript, tape recording or written summary" of the hearing indicating "the evidence considered, the evidence relied on, and the findings of the hearing panel with supporting reasons." (Regs., §§ 2254, 2255, italics added.)

In this case, the decision denying petitioner parole is set forth in the last seven pages of the transcript of the March 4, 2010 hearing after the panel adjourned to deliberate and returned to announce and explain its decision, which portion of the transcript is separately paginated and entitled "Decision." Our analysis of the evidence the Board relied on and its reasoning focuses upon this written statement.

in *Young*— that petitioner has "reasonably stable relationships with others," that he repeatedly expressed responsibility and "remorse" regarding the commitment offense, that the chief cause of his crime, alcoholism, resulted from "significant stress in his life [that] has built over a long period of time," that he "made realistic plans for release" and "developed marketable skills that can be put to use upon release," and that his "institutional activities indicate an enhanced ability to function within the law upon release." (Regs., § 2402, subd. (d)(2), (3), (4), (8), (9).) But the Decision also never considers several other regulatory factors pertaining to suitability for parole: that petitioner has no juvenile record (Regs., § 2402, subd. (d)(1) [no "record of assaulting others as a juvenile or committing crimes with a potential of personal harm to victims"]; that he has no serious criminal history (Regs., § 2402, subd. (d)(6) [absence of "any significant history of violent crime"]); and that he is 65 years of age and suffers from diabetes and renal failure (Regs., § 2402, subd. (d)(7) [advanced age reduces probability of recidivism]).[13]

The Board Decision in this case simply ignores petitioner's "exemplary prison record and extensive rehabilitative programming," which indicates "an enhanced ability to function within the law upon release." (Regs., § 2402, subd. (d)(9); see *In re Young* (2012) 204 Cal.App.4th 288.) During the quarter of a century he has been confined—and particularly the last 13 years most pertinent to an assessment of his current dangerousness—petitioner has been a model prisoner. His supervisors have consistently rated his performance in work programs and participation in self help groups as "exceptional." Petitioner has actively participated in almost every relevant self-help group made available to him, particularly those pertaining to alcohol and drug abuse and stress and anger management. His other institutional activities, and the insights into himself and his crime these activities helped provide him, were seen by all of the Board psychologists and correctional counselors who evaluated petitioner as positive

---

[13] The only regulatory factor the Board justifiably ignored was that petitioner did not suffer from "Battered Woman Syndrome" when he committed his crime. (Regs., § 2402, subd. (d)(5).)

indications of his suitability for release. As earlier noted, he has collaborated with supportive individuals and groups, including his tribe, to produce a realistic plan for release. He paid restitution by voluntarily participating in work programs that compensate inmates and used his meager prison wages to eventually pay $3,000 in full restitution. He has received scores of laudatory chronos from correctional staff commending the "proficient and exemplary manner" in which he performed his duties, describing him as "conscientious," "courteous," "knowledgeable," possessing "a wide range of clerical skills," an "excellent" attitude, and able to work well with other inmates and correctional staff. He has been virtually disciplinary free since the day he entered prison. Finally, all of the risk assessments made of petitioner show him to present a low risk of danger to the public if released.

Our concern is not that the Board accorded insufficient weight to the foregoing relevant factors—an evaluation outside the scope of our review—but that it did not duly consider them in the first place, as its regulations require (Regs., § 2402, subd. (b)), and its Decision provides no rational justification for the failure to do so. Board regulations identify six circumstances tending to show unsuitability for parole, and nine tending to show suitability (Regs., § 2402, subds. (c) and (d)). Reliable information indicating the applicability to petitioner of almost all of the regulatory factors tending to show suitability was readily available to the panel, but virtually none of it is mentioned in the Board's Decision. The Board failed to even mention in its Decision any of the psychological evaluations of petitioner, which discuss the application to petitioner of many of the regulatory factors. These evaluations are required to be made by the Board's own regulations (Regs., § 2240), and are painstakingly prepared by licensed professionals designated and paid by the Board. The Board's disregard of the regulatory factors and psychological evaluations is unexplained, unjustified, and indeed disturbing.

As we pointed out in *In re Barker* (2007) 151 Cal.App.4th 346, the Board's failure to comment on applicable suitability factors represents not just a failure to undertake the "individualized consideration of all relevant factors" mandated by the Supreme Court more than a decade ago (*In re Rosenkrantz, supra*, 29 Cal.4th at p. 655), but offends its

29

own regulations. (*In re Barker,* at p. 370, fn. 21, citing Regs., § 2281, subd. (b).) More recently, in *In re Prather, supra*, 50 Cal.4th 238, the Supreme Court reiterated that the Board "*must* consider the statutory factors concerning parole suitability set forth in section 3041 as well as the Board regulations [citation], and that 'because due process of law requires that a decision considering such factors be supported by some evidence in the record, the Governor's [and the Board's] decision is subject to judicial review to ensure compliance with this constitutional mandate.' " (*Id.* at p. 251, italics added, quoting *Rosenkrantz, supra*, 29 Cal.4th at p. 664.) Nothing in *Shaputis II* relieves the Board of the requirement to consider all relevant evidence in the record bearing upon suitability, and specifically the enumerated statutory and regulatory factors, indeed, as we have said, *Shaputis II* reaffirms that requirement. (*Shaputis II, supra*, 53 Cal.4th at p. 210.)

The failure of the deputy commissioner acknowledged that the three risk assessment tools used to measure petitioner's current dangerousness all placed him in the low range for recidivism. However, the deputy commissioner pointed out, Dr. Hayward "opines that your risk would increase if you resumed the use of alcohol, had difficulty maintaining housing in a clean and sober environment, or had difficulty obtaining employment that would provide you with sufficient income for your daily needs."

Petitioner acknowledged these dangers and never sought to downplay them. As earlier indicated, his relapse prevention plan, the centerpiece of petitioner's presentation at the parole hearing, addressed all of the concerns referred to by Dr. Hayward. The STC live-in program petitioner's tribe was willing to support insured petitioner would associate with "prosocial individuals," "maintain housing in a clean and sober environment," and that he would have sufficient income for his daily needs. The risk assessments are required by Board regulations to be periodically made (Regs., § 2240) and, as we have said, the regulations also require consideration of special conditions of release such as those petitioner presented, which included a no alcohol condition of parole. (Regs., §§ 2402, subd. (b); 2513.)

30

We do not employ this evidence to conclude that the evidence shows petitioner suitable for release on parole, but only to show the Board's failure to consider a substantial body of evidence in the record to that effect. The Board's failure to consider such evidence in its Decision reflects indifference not just to relevant evidence but as well to the decision process prescribed by its own regulations, and the "reasoning" required by the seminal decision in *Lawrence, supra*, 44 Cal.4th at page 1210.

In *In re Morganti, supra,* 204 Cal.App.4th 904, we concluded that "[t]he risk a former drug or alcohol abuser will relapse, which can never be entirely eliminated, cannot of itself warrant the denial of parole, because if it did the mere fact the inmate was a former substance abuser would 'eternally provide adequate support for a decision that [he] is unsuitable for parole.' " (*Id*. at p. 921.) We held that "[t]he risk an inmate may fall back into alcohol or drug abuse can justify denial of parole only where it is greater than that to which a former drug or alcohol abuser is normally exposed." (*Ibid*.) Our dissenting colleague finds evidence that the risk petitioner could revert to alcohol abuse upon release is greater than that to which a former alcohol abuser is normally exposed not just in petitioner's "lack of insight into why he acted as he did," which we later discuss, but also "his limited progress in coming to terms with alcohol abuse," and "the severity of his problem with alcohol." (Dis. opn. of Haerle, J., at p. 11.) Justice Haerle finds "some evidence" of petitioner's "limited progress in AA" in "petitioner's own acknowledgment of its role in his recovery," and "the indications of his limited progress in the Native American Spiritual Circle."

Petitioner's acknowledgment of the value of AA and intention to continue with it after release cannot, in our view, reasonably be considered evidence that his progress in addressing his alcoholism is "limited." Nor do we think petitioner's progress in the Native American Spiritual Circle, which in recent years has been at the center of his life, "limited"; and the Board made no such finding. To begin with, it is doubtful any alcohol abuse programs are more aware of the perniciousness of the problem of alcoholism

31

among Native Americans [14] than those specially designed to address it, such as the Native American Spiritual Circle and STC.   Chronos documenting petitioner's active participation in the Native American Spiritual Circle indicate it began at Folsom Prison in 1987, the year he entered prison and became increasingly active over time.  By 1991, petitioner possessed considerable "knowledge and understanding" of the American Indian belief system and practices, and he began regularly participating in the Native American Spiritual Circle in 1995.  The chronos show that "the practice of sobriety through abstinence from drugs and/or alcohol, through education, song, storytelling, and tribal practices," which the Native American Spiritual Circle fostered, "equate to a daily way of life for the participants as it is for all American Indians" and that this program (and some others focusing on Native Americans) "are equal to or exceed the expectations of the twelve steps of Alcoholics Anonymous and Narcotics Anonymous recovery groups, as participants must not only abstain from alcohol and controlled substances on a daily basis for individual growth and development, but also, they must be alcohol and drug free to participate in the Inipi (Sweatlodge) ceremony for spiritual purposes. A chaplain who supervised petitioner for many years opined that his participation in the "Indian Spiritual Program" has been a source of strength for him and also "a stabilizing influence within the Indian Group."

We cannot say whether petitioner's participation in the Native American Spiritual Circle and AA and his relapse prevention plan adequately address his alcoholism problem, and we certainly do not decide that question.  All we say is that the Board, whose lengthy decision never mentions petitioner's deep involvement in the Native American Spiritual Circle and devoted only a single sentence to AA—the presiding commissioner's statement that "I appreciate all the work you've done with your AA, but you're on step 5 and you need to work through your steps"—has not adequately

---

[14] In a declaration to the court that sentenced petitioner to prison in 1987, Dr. Albert Globus stated that "there is abundant anecdotal and scientific literature that Indians, along with some Orientals, have a metabolic defect such that they cannot destroy alcohol in their systems as rapidly as Caucasians[, which] may result in a lower threshold for amnesic episodes in Indians than for Caucasians."

considered the relevant evidence, particularly that relating to the STC relapse prevention plan.

The evidence related to the efficacy of petitioner's participation in the Native American Spiritual Circle, and the adequacy of the relapse prevention plan he developed with the assistance of STC, appear to have been ignored by the Board because those issues were unrelated to the chief reason it found petitioner lacked insight and denied him parole. We turn now to that issue.

## IV. There is No Rational Nexus Between the Evidence the Board Relied Upon to Deny Petitioner Parole and His Current Dangerousness

Emphasizing that the commitment offense was "terribly atrocious, heinous, [and] cruel," the Decision makes clear that, notwithstanding petitioner's acceptance of full responsibility for his criminal act and unquestioned remorse, the overriding issue for the panel was the extent to which petitioner's inability to remember committing his offense obstructed his ability to understand the factors that caused the criminal act.

As the presiding commissioner stated at the outset of the Decision: "Mr. Stoneroad, I've got to tell you some things here. This panel could not get past—I asked you a lot of questions about understanding this life crime, and I know you say you don't remember, but if you don't remember, at least you should have some kind of understanding of how this happened, and you don't even have an understanding on how this crime happened." After pausing to acknowledge that the panel was impressed that petitioner paid restitution and showed "remorse," the presiding commissioner continued: "I understand that you probably just don't remember. I think that's probably true. I don't feel that you're being dishonest with this Panel, but I think you need to find out how, what events could have possibly led to this terrible and heinous crime? What could have brought you to do this, where a young man, a young 17—as you call him Mikey, right, ended up dead? It's too great a risk for this Panel to give you a date if you don't know

33

why. I hope you think about that, sir. I hope you do. And I hope there's something that in the future you can come up with, with how this happened." [15]

At that point the deputy commissioner admonished petitioner as follows: "[W]hen you get the transcripts of this hearing, please carefully read them and see if you can resolve the reality of not remembering the incident with those actions that occurred prior to the incident. And that might provide you with some way of clarifying the sequence of events. If you don't remember what occurred, it is not this Panel's intention to encourage you to make something up."

The significance the Board attached to petitioner's inability to remember committing his offense, as demonstrated by its Decision, was evident the moment the hearing commenced. Even before petitioner rose to testify, the presiding commissioner observed that "one of the biggest issues, as you know counsel . . . . this Panel likes to understand is insight. Right? So, sometimes, though, it's difficult to understand insight without getting into the life crime, which it certainly is his right not to talk about the life crime, and he certainly doesn't have to.[16] But if I get too close to the life crime or something he doesn't want to talk about, he certainly doesn't have to, and this Panel will not hold that against him." The presiding commissioner's repeated references to petitioner's inability to recall commission of the life crime, and the references to the subject in the Board's decision, indicate that petitioner's inability to discuss the crime *was* held against him.

Perceiving petitioner was "not going to talk about the life crime" because he had no memory of it, the presiding commissioner asked him "have you ever talked about the

---

[15] This statement seems to us tantamount to requiring petitioner to change his or her story to be found suitable for parole. Because petitioner cannot now, or ever, credibly "come up with something" to satisfy the Board's view that his suitability for release depends on his ability to recall commission of the commitment offense, his lack of recall becomes an immutable factor that can always be used to deny him parole

[16] Board regulations provide that "[a] prisoner may refuse to discuss the facts of the crime in which instance a decision shall be made based on the other information available and the refusal shall not be held against the prisoner." (Regs., § 2236.)

34

life crime?" are there "any documents . . . that I could go to?" "Did you talk to the probation officer about the life crime, sir, or—I've got to have something that I—well, I don't have to, but it would be nice." Petitioner repeated that he could not remember the event and the commissioner again stated, "So, that's basically your statement." Petitioner said "yes," the commissioner repeated "You just don't know what happened," and petitioner again stated: "I don't recall what happened, actually**."** Alert to the panel's interest in this issue, the district attorney present at the hearing emphasized that "the lack of recalling what really had happened here . . . [is] really, really important," and urged the members of the panel "to look very closely" at that issue. They certainly did so. Petitioner's inability to recall his actual commission of the crime was raised by the panel repeatedly throughout the proceedings and, as indicated, is the gravamen of its Decision.

This is not the first case in which an inmate has been denied parole due his inability to remember committing his offense. In *In re Young, supra*, 204 Cal.App.4th 288, the presiding commissioner also focused on the petitioner's lack of memory about his offense, "stating that it was 'extraordinarily unusual' that he 'virtually [did not] recall at all" assaulting [his victim], given that he struck [him] with 'many' blows and strangled her. The presiding commissioner stated, 'you recall that you had coke and alcohol, as you report, prior to this event. You recall her attacking you, but from that point on nothing. We're going to encourage you to think more about that, pray more about that, deal with that, because it's not that we want anyone to grovel over what they did. Goodness knows, people that are on that side of the table have done horrible things. It's that we want you to come to grips with it, speak of it." (*Id.* at p. 307) We rejected the Board's reliance on Young's inability to recall commission of his offense due to the absence of evidence it was "extraordinarily unusual" for a person to have no recollection of such a crime, or that the petitioner "*could* recall more about what happened by 'thinking' and 'praying' more about it. . . . The Board simply speculated about what people should and can recall when they commit extraordinarily violent acts." (*Id*. at p. 308.)

35

We also explained in *Young* that an inmate's lack of insight into the causes of his criminal conduct cannot rationally be inferred from his inability to remember the conduct where, as in this case, he acknowledges his factual, legal and moral responsibility for the criminal act, and has expressed genuine remorse. In this connection, we relied on in *In re Juarez* (2010) 182 Cal.App.4th 1316, another case in which the Board improperly used an inmate's inability to remember commission of his offense to question his credibility and find him currently dangerous. At the close of the hearing in *Juarez*, the presiding commissioner told the inmate that, because "the Board could not 'solve this . . . apparent dilemma,' [it] would request a new psychological evaluation addressing his claims to not remember his crimes, and instructed Juarez to 'take the initiative' to 'resolve this situation.' " (*Id.* at p. 1333.) Rejecting this reasoning, we noted that the Board disregarded that Juarez "had for some time fully accepted responsibility for [his crime], did not dispute his commission of the offenses," and that the Board allowed the inability to remember commission of his offenses to blind it to the more probative facts that Juarez "had been a model prisoner for years, an ongoing participant in AA and a past participant in NA, acknowledged that he was an alcoholic and drug addict, and pledged to continue attending AA meetings after his release." (*Young, supra*, 204 Cal.App.4th at p. 308, citing *Juarez, supra*, 182 Cal.App.4th at p. 1320.) In short, as we said in *Young* about *Juarez*, "[w]e determined that Juarez's failure to recall the details of his commitment offense had no bearing on his current dangerousness because he took responsibility for both the crime and his substance abuse. (*Young,* at pp. 308-309.)

Our analysis in *Juarez* and *Young* is fully applicable here. No evidence in the record supports the purely speculative proposition—i.e., "guesswork"—that a person who does not remember committing a crime cannot understand the factors that caused him to commit the offense regardless whether he accepts full responsibility and is genuinely remorseful. As we reiterated in *Young*, " ' "[s]omewhere along the evidentiary spectrum, a rational inference loses its character if one or more of the premises upon which it rests, fails. When this happens, the inference becomes irrational speculation." ' (*In re Loresch* (2010) 183 Cal.App.4th 150, 164 . . . .)" (*Young, supra*, 204 Cal.App.4th at p. 306.)

36

There is in the present case no evidence suggesting petitioner's admitted inability to recall commission of his crimes obstructs his understanding of the factors that caused him to commit them. To begin with, nothing in the record calls into question the authenticity of petitioner's lack of recall. The psychologists and others who evaluated him all accepted the disability as genuine[17] and none suggested it has in any way impaired his insight into the factors that caused him to commit his crimes. As the Board has been repeatedly reminded by the courts, when it considers a factor related to the commission of the life offense to be predictive of current dangerousness, "it must articulate why that is the case. (*In re Roderick* (2007) 154 Cal.App.4th 242, 264.) ' "[I]mmutable facts such as an inmate's criminal history" . . . do not by themselves demonstrate an inmate "*continues* to pose an unreasonable risk to public safety." (*Lawrence, supra*, 44 Cal.4th at p. 1221, original italics.)' ([*In re*] *Sanchez* [(2012)] 209 Cal.App.4th [962,] 975.)" (*In re Denham, supra*, 211 Cal.App.4th 702, 717.) Despite the Board's relentless fixation with petitioner's inability to fully recall his commission of the life offense, no member of the panel ever explained why this disability impairs his ability to understand the causes of the offense and shows he continues to pose an unreasonable risk to public safety.

---

[17] Indeed, the evidence affirmatively attests to the authenticity of petitioner's lack of memory. Expert witnesses testimony at petitioner's trial established that "alcohol blocks neurotransmission in the cerebral cortex," and that at appellant's level of intoxication "virtually all cerebral activity is shut down" so "it is credible that he is not capable of having a memory of the crime." Psychiatrist Albert Globus, who interviewed appellant in 1987, stated in a report to the sentencing court that appellant drank nearly three bottles of vodka the day of the offense and had very little to eat. In light of this he found it unremarkable that petitioner "recalls little or nothing" about the event. Dr. Globus explained that consumption of great amounts of alcohol can create an "abnormal neurophysiological state, called amnestic episodes secondary to alcohol ingestion [resulting in a] breakdown in brain function" and scientific testing following controlled experiments have shown "that there is very little or no memory of the events." Therefore, Dr. Globus stated in his report "it is possible for someone to carry out a relatively complex series of behaviors, which may in fact result in serious disturbance to their's and other's lives, without having an accurate memory of those events." No evidence in the record suggests petitioner's inability to recall committing his offense is feigned or otherwise inauthentic.

A factually identifiable deficiency in perception and understanding that involves a significant aspect of an inmate's criminal conduct, and has some rational tendency to show he poses an unreasonable risk of danger, may show an inmate unsuitable for parole. But it is not enough to establish that the insight is deficient in some specific way; there must additionally be some connection between the deficiency relied upon and the conclusion of current dangerousness. (*In re Morganti, supra,* 204 Cal.App.4th at p. 923.) The requisite connection is not present in this case. Petitioner's inability to recall commission of the life offense does not, ipso facto, indicate he constitutes a threat to public safety.

It is also worth noting that petitioner's inability to recall commission of his offense at the time he was arrested more than 25 years ago and consistently since then has never previously been questioned or used by the Board to demonstrate current dangerousness. When petitioner was last denied parole in 2006, nothing was said to him about this issue. He was told that in order to get a release date he needed to: "(1) Stay discipline free; (2) Get self-help; (3) Earn positive chronos; (4) Learn a trade; (5) Get therapy; and (6) Get a GED." When he appeared before the Board in 2010, petitioner had accomplished all of these goals save the last, a deficiency the Board ignored at the 2010 hearing. Petitioner's substantial compliance with the Board's 2006 directive availed him nothing; instead, a new theory of unsuitability was suddenly presented.

The Board's reliance on lack of insight in this case is readily distinguishable from its proper use of that factor in *Shaputis II, supra*, 53 Cal.4th 192. Shaputis's lack of insight was established by, among other things, his own statements about the shooting of his wife, "which failed to account for the facts at the scene or to provide any rational expectation of the killing." Shaputis argued "that his inability to recall the circumstances of the crime is an immutable factor" and "he would be require to engage in fabrication to show insight." (*Id.* at p. 216.) However, the court found "no support in the record" for Shaputis's asserted inability to remember the crime. In the present case, petitioner's inability to remember the offense is supported by abundant undisputed evidence and acknowledged by the Board. The question here is whether "some evidence" supports the

38

Board's conclusion that petitioner's conceded inability to remember his offense prevents him from "gain[ing] insight or understanding into either his violent conduct or his commission of the commitment offense." (*Id*. at p. 218, quoting *Shaputis I, supra,* 44 Cal.4th at p. 1260.) Apparently considering the idea self-evident, the Board did not identify, and we cannot find, any evidence in the record supporting the proposition that a person cannot understand the causes of a violent act, including one for which he accepts personal responsibility, if he is unable to fully recall his commission of the act.

The theory relied upon by the Board is remarkable not just because there is no evidence in the record to support it, but also because the record contains abundant evidence, also ignored by the Board, that petitioner understands the factors that led him to commit his crimes, and what he needs to do to insure that they do not again come into play. As we have seen, in his testimony at the parole hearing petitioner articulately described (1) the sources of his suppressed anger and rage, (2) the ways in which these factors led to his alcoholism, (3) the manner in which intoxication lowered his inhibitions and released the rage he was otherwise able to repress, and (4) the steps he needed to take to stay sober and safe.[18] Dr. Hayward's 2009 evaluation of petitioner confirms petitioner

---

[18] The evidence the dissent relies upon to show lack of insight is the asserted inconsistency between petitioner's statement to a psychologist in 2009 that "[i]t seemed like somebody jumped on me full force from the back . . . . Maybe [Kane] was trying to protect his mother," and petitioner's testimony at the hearing that this statement was "just speculating," that he actually didn't remember what happened, and that it was "a mystery" to him why the crimes happened. (Dis. opn. of Haerle, J., at p. 6.) There is no inconsistency. Petitioner's testimony that he was "just speculating" was made at the hearing in the course of cross-examination by the district attorney, which called for speculation. Stating that he wanted to know whether "you have no more memory of what happened and why it happened than you did four years [ago]," the district attorney reminded petitioner that in 2009 he had told Dr. Hayward "you thought maybe Mikey was trying to protect his mother." Petitioner responded: "I think I was just speculating." Petitioner's brief statement to Dr. Hayward was *obviously* speculative; but it is not inconsistent with an absence of memory of the offense or indicative of any lack of insight. Any normal person who had admittedly injured another by conduct he could not remember and deeply regretted, and which had long been a "mystery" to him, would naturally speculate about the reasons for his conduct. The statement does not, as the dissent claims, provide "some evidence" that petitioner has continued to minimize the

39

possesses these understandings as, in varying degrees, do earlier evaluations of petitioner by other Board psychologists and correctional counselors. Lacking authority to reweigh the evidence, our responsibility is merely to determine whether some evidence in the record supports the theory upon which the Board found petitioner unsuitable for release. The record before us requires us to conclude that the theory upon which the Board denied parole in this case—that an inmate unable to recollect commission of his offense cannot understand the factors that caused him to commit it—is not only irrational where, as here, the inmate accepts responsibility and is remorseful, but entirely unsupported by evidence.

Finally, we think it appropriate to note, by way of obiter dictum, that the Board's strained efforts in this and many other cases to deny parole on grounds that cannot withstand legal scrutiny[19] appear incongruent with the present predicament of our correctional system. Severe overcrowding in California's prison system and its impact on the provision to inmates of adequate medical and mental health care has recently been found by the United States Supreme Court to violate the Eighth Amendment prohibition

violence involved in the crimes." (*Ibid.*) There is no evidence petitioner has ever minimized the violence of his commitment offense. Indeed, the relevant evidence is all to the contrary. Petitioner's statement to a psychologist denying he had "ever hit a woman," which the dissent considers "some evidence" petitioner is in "denial of his violent tendencies toward Irwin" (*ante*, at p. 7), followed candid acknowledgments of violent altercations with Irwin and other women. In context, petitioner's denial that he ever "hit a woman" meant only that this acknowledged violence never included the use of a fist. This statement did not prevent Dr. Hayward from concluding, as did all of the other psychologists, that petitioner "presents a low risk of violence in the free community." Nor did the Board ever indicate any concern about the statement the dissent seizes upon.

[19] See, e.g., *In re Denham, supra,* 211 Cal.App.4th 702; *In re Hunter* (2012) 205 Cal.App.4th 1529; *In re Sanchez, supra,* 209 Cal.App.4th 962*; In re Morganti, supra,* 204 Cal.App.4th 904; *In re Young, supra,* 204 Cal.App.4th 288; *In re Jackson* (2011) 193 Cal.App.4th 1376; *In re Powell* (2010) 188 Cal.App.4th 1530*; In re Juarez, supra,* 182 Cal.App.4th 1316; *In re Criscione* (2009) 173 Cal.App.4th 60; *In re Lazor* (2009) 172 Cal.App.4th 1185; *In re Singler* (2008) 169 Cal.App.4th 1227; *In re Roderick, supra,* 154 Cal.App.4th 242; *In re Barker, supra,* 151 Cal.App.4th 346; *In re Weider* (2006) 145 Cal.App.4th 570; *In re DeLuna* (2005) 126 Cal.App.4th 585; *In re Scott* (2004) 119 Cal.App.4th 871.

on cruel and unusual punishment.  (*Brown v. Plata* (2011) 563 U.S. ___, 179 L.Ed. 969, 131 S.Ct.1910.)  At the time of trial in *Plata*, California correctional facilities held about 156,000 inmates, nearly double the number they were designed to hold.  Finding that this situation has "overtaken the limited resources of prison staff" and imperiled the safety of both correctional employees and inmates, the Supreme Court affirmed an order directing reduction of the state prison population to 137.5% of design capacity, a reduction of as many as 46,000 persons.  (*Id*. at p. 1923.)  The mandated reduction still has not been fully accomplished.  (Calif. Dept. of Corrections & Rehabilitation, Offender Information Services Branch, *Prison Census Data as of June 30, 2012* (August 2012) Table 10.)  Additionally, the staggering overall cost of prison health care—projected to be $1.5 billion for the current fiscal year—is disproportionately attributable to the care and treatment of ill and aging inmates,[20] most of whom are indeterminately sentenced life prisoners, who now constitute more than one-fourth of the state's prison population. (Calif. Dept. of Corrections & Rehabilitation, *supra*, *Prison Census Data as of June 30, 2012,* Table 10.)  The routine denial of almost all parole applications made by life prisoners at the time the Legislature expected a release date would "normally" be set (see *In re Morganti, supra*, 204 Cal.App.4th at pp. 929-930 (conc. & dis. opn. of Kline, P.J.;

---

[20] (Calif. Correctional Health Care Services, *Achieving a Constitutional Level of Medical Care in California's Prisons*, Twenty-second Tri-Annual Report of the Federal Receiver's Turnaround Plan of Action for September 1 – December 31, 2012 (Jan. 25, 2013) at pp. 32-33; available at http://www.cphcs.ca.gov/docs/court/T22 20130125 TriAnnualReport.pdf.)  Among other things, this report states that "Clinical risk is one of the most important factors in the overall costs of hospital care, and those costs are concentrated in older inmates.  Our data shows that average costs for patients at the highest clinical risk and with the most complex cases are nearly 10 times the costs of the lowest risk patients ($4,942 per month for highest risk versus $532 per month for low risk). Only 2.6% of our patients fall into the highest clinical risk category, yet these patients cost CDCR approximately $190,000,000 per year. Sixty percent of these patients are over 50 years of age and eighty-five percent are over 40 years of age.  Clearly, we are spending a large sum of money to provide medical care  to a relatively small number of aging, ill inmates.  Unless the State constructively addresses this issue, its increasingly geriatric population of inmates will continue to sap General Fund moneys for necessary health care." (*Id*. at pp. 32-33.)

§ 3041, subd. (a)) does not appear necessary to protect public safety, because, due to their age, the recidivism rate of lifers is dramatically lower than that of all other state prisoners, indeed infinitesimal.  (Weisberg et al., Stanford Criminal Justice Center, *Life in Limbo: An Examination of Parole Release for Prisoners Serving Life Sentences with the Possibility of Parole in California* (Sept. 2011) 1, 17 (the *Stanford Study*).)[21]

On January 7, 2013, the Governor asked the three-judge federal court convened in the cases adjudicated in *Brown v. Plata, supra*, 563 U.S. ___, 179 L.Ed. 969, 131 S.Ct.1910, to vacate the order, which had been upheld by the Supreme Court, directing him to reduce the prison population to 137.5% of design capacity.  In denying the Governor's motion, the three-judge court found, among other things, that the state had failed to take many of the measures identified in the court's prior order and opinion, specifically including the "release or diversion of certain [s]ub populations, such as women, the elderly and the sick from prison to community-based facilities."  (*Coleman v. Brown* (E.D. Cal, April 11, 2013) ___F.Supp.2d___ at p. ___ [2013 WL 1500989, at p. *39].)  Citing the *Stanford Study*, the three-judge court lamented the fact that "despite their low level of recidivism," very few lifers have been released.  (*Coleman v. Brown*, at *39, fn. 47.)  As the court pointed out, notwithstanding the fact that 14% of California's lifer population, which consists of over 30,000 prisoners, are over 55 years of age, the state "has taken no meaningful action to release elderly low-risk prisoners in this category."  (*Id*. at *39.)

---

[21] This study observes that "among the 860 murderers paroled by the Board since 1995, only *five* individuals have returned to jail or returned to the California Department of Corrections and Rehabilitation for new felonies since being released, and none of them recidivated for life-term crimes.  This figure represents a lower than one percent recidivism rate, as compared to the state's overall inmate population recommitment rate to state prison for new crimes of 48.7 percent.  (Stanford Study*, supra*, p. 17, fn. omitted.)  The study also notes that other studies "demonstrate that as a general matter, people age out of crime.  For most offenses—and in most societies—crime rates rise in the early teenage years, peak during the mid-to-late teens, and subsequently decline dramatically.  Not only are most crimes committed by persons under 30, but even the criminality that continues after that declines drastically after age 40 and even more so after age 50."  (Stanford Study*, supra*, p. 17, fn. omitted.)

At the time he was denied parole, petitioner was 65 years of age and suffered from both diabetes and renal failure. The Board's failure to pay any attention to, or even mention, these (and many other) factors indicative of suitability for release under its own regulations (Regs., § 2402, subd. (d)(7)), is not only unlawful, unreasonable, and unfair, but inimical to the state's effort to rectify ongoing constitutional violations in the California prison system.

## CONCLUSION

The petition is granted and the matter remanded for a new parole hearing pursuant to *In re Prather, supra,* 50 Cal.4th 238.


_____
Kline, P.J.


I concur:


_____
Lambden, J.

**Dissenting opinion of Haerle, J.**

I respectfully dissent from that portion of the majority's opinion that agrees with appellant's contention that the Board of Parole Hearings (the Board) decision was "arbitrary and unsupported by some evidence of his current dangerousness." (Maj. opn. at p. 1.) I do so for several reasons: (1) although my colleagues cite most of the relevant authority regarding the standard of review we are required to use in cases such as this, a standard made very clear by our Supreme Court in *In re Shaputis* (2012) 53 Cal.4th 192 (*Shaputis II*), they fail to apply the core "modicum of evidence" test articulated in that case to the record before us; (2) they effectively ignore the ample evidence in the record supporting the Board's decision and, instead, set forth why, in their view, the Board should have decided this case differently; and (3) finally, they overlook some of the specific legal points made by the *Shaputis II* court and other facts present in the record of this case.

### A. *The Governing Law*

In concluding its unanimous decision in *Shaputis II,* our Supreme Court listed five factors governing review by the judicial branch of Board decisions regarding suitability for parole. (*Shaputis II, supra,* 53 Cal.4th at pp. 220-221.) In the interest of brevity, I will not quote them all but note that the first point is that the "essential question in deciding whether to grant parole is whether the inmate currently poses a threat to public safety." The second point is that the Board and the Governor "draw their answers" to that question "from the entire record, including " 'the insight he or she has achieved into past behavior.' " (*Id*. at p. 221.)

The court then concluded with these two important governing principles:

"4. Judicial review is conducted under the highly deferential 'some evidence' standard. The executive decision of the Board or the Governor is upheld unless it is arbitrary or procedurally flawed. The court reviews the entire record to determine whether a *modicum of evidence* supports the parole suitability decision.

"5. *The reviewing court does not ask whether the inmate is currently dangerous. That question is reserved for the executive branch*. Rather, the court considers whether

1

there is a rational nexus between the evidence and the ultimate determination of current dangerousness. *The court is not empowered to reweigh the evidence*." (*Shaputis II, supra,* 53 Cal.4th at p. 221, italics added.) As, I believe, they also did in *Young*, I submit that the majority effectively ignores these standards here. There is *clearly* a "modicum of evidence" supporting the Board's decision.[1] That evidence falls into two categories; first, his continued lack of insight and, second, his failure to adequately recognize and deal with his alcohol addiction.

Since the publication of *Shaputis II* a little over a year ago, several of our sister courts have recognized its clear meaning and import.[2] Thus, in *In re Mims* (2012) 203 Cal.App.4th 478, 486, our colleagues in Division Two of the Fourth District wrote: "Under the 'some evidence' standard, only a modicum of evidence is required to uphold a decision regarding suitability for parole. ([*Shaputis II, supra,*] 53 Cal.4th 192 . . .; *In re Rosenkrantz* [(2002)] 29 Cal.4th [616,] 677.) It is not for the reviewing court to decide *which* evidence in the record is convincing. (*Shaputis II*, at p. 211.) While the standard is not 'toothless' and ' "must be sufficiently robust to reveal and remedy any evident deprivation of constitutional rights" [citation], it must not operate so as to "impermissibly shift the ultimate discretionary decision of parole suitability from the executive branch to the judicial branch" [citation].' (*Id*. at p. 215.) Thus, when the parole authority declines to give credence to certain evidence, a reviewing court may not interfere unless that determination lacks any rational basis and is merely arbitrary. (*Ibid*.)"

Others of our sister courts have also stressed the significance of *Shaputis II*. Thus, another division of the Fourth District recently wrote in *In re Tapia* (2012) 207 Cal.App.4th 1104, 1113: "The rule of *In re Palermo* [(2009) 171 Cal.App.4TH 1096] has been called into question by the Supreme Court's decision in [*Shaputis II*],

---

[1] The relevant standard is *not*, as the majority suggests, whether there is "a modicum of evidence in the record rationally indicative of current dangerousness . . . ." (Maj. opn., p. 20.) It is, rather, whether there is a "modicum of evidence [which] supports the parole suitability decision." (*Shaputis II, supra,* at p. 221.)

[2] In addition to the cases discussed below, see also *In re Shigemura* (2012) 210 Cal.App.4th 440, 454-455.

*supra*, 53 Cal.4th at pages 214-215, in which the court held the record must be viewed in the light most favorable to the Board's decision, and that when 'the parole authority declines to give credence to certain evidence, a reviewing court may not interfere unless that determination lacks any rational basis and is merely arbitrary.' The Board's decision in this case does not lack any rational basis, and is not merely arbitrary."

Later in 2012, the Third District also recognized the change wrought by *Shaputis II*. In *In re Montgomery* (2012) 208 Cal.App.4th 149, 164, that court wrote: "On the record before us, we cannot say that the evidence 'leads to but one conclusion.' (*Shaputis II, supra*, 53 Cal.4th at p. 211.) Accordingly, we must affirm the Board's decision. Our Supreme Court had made it clear that we are not to reweigh the evidence, nor to substitute our own judgment for the Board's. We hold that some evidence—that is, 'more than a modicum' (see *Shaputis II, supra*, 53 Cal.4th at p. 219)—supports the Board's finding of lack of insight into the causative factors leading to the life offense, as well as lack of insight into addiction issues, as evidenced by Montgomery's conduct leading to his 115 [a penal rules violation report]. Due to the nature and characteristics of the life offense, there is a rational nexus between the Board's findings and its determination of current dangerousness." As a result of this conclusion, the Third District vacated a pre-*Shaputis II* order of the superior court granting that petitioner's habeas corpus petition.

Finally, earlier this year, our colleagues in the Sixth District also recognized the significance of *Shaputis II* in *In re Stevenson* (2013) 213 Cal.App.4th 841 (*Stevenson*). In that case, the Sixth District reversed a trial court's grant of habeas relief and, in so doing, summarized the importance of *Shaputis II* in redefining the posture of the courts in reviewing Board decisions: "The California Supreme Court clarified the courts' role in reviewing parole suitability decisions in its recent opinion in *Shaputis II, supra*, 53 Cal.4th 192. 'The essential question in deciding whether to grant parole is whether the inmate currently poses a threat to public safety.' (*Id*. at p. 220.) The Board or the Governor draws the answers to that question 'from the entire record, including the facts of the offense, the inmate's progress during incarceration, and the insight he or she has

achieved into past behavior.' (*Id*. at p. 221.) 'The inmate's insight into not just the commitment offense, but also his or her other antisocial behavior, is a proper consideration' (*Id*. at p. 219.) The Board and the Governor may consider 'the inmate's understanding of the crime and the reasons it occurred, or the inmate's insight into other aspects of his or her personal history relating to future criminality.' (*Id*. at p. 220.) As indicated, 'a parole suitability decision is an "attempt to predict by subjective analysis whether the inmate will be able to live in society without committing additional antisocial acts." [Citations.]' (*Id*. at p. 219.) [¶] 'Judicial review is conducted under the highly deferential "some evidence" standard.' ([*Shaputis II,*] at p. 221.) 'The "some evidence" standard is intended to guard against arbitrary parole decisions, without encroaching on the broad authority granted to the Board and the Governor. [Citations.]' (*Id*. at p. 215.) 'The court reviews the entire record to determine whether a *modicum of evidence* supports the parole suitability decision.' (*Id*. at p. 221, italics added, [fn. omitted by this court].) '[C]ourts consider only whether some evidence supports the ultimate conclusion that the inmate poses an unreasonable risk to public safety if released. [Citation.]' (*Id*. at p. 19.) [¶] The 'some evidence' standard of review does not equate to the more demanding 'substantial evidence' standard of review. ([*Shaputis II,*] at p. 214.) But similar to a court reviewing the substantiality of the evidence, a court reviewing a parole unsuitability determination by the Board or the Governor 'must consider the whole record in the light most favorable to the determination before it, to determine whether it discloses some evidence—a modicum of evidence—supporting the determination that the inmate would pose a danger to the public if released on parole. [Citations.]" (*Ibid.*) 'The court is not empowered to reweigh the evidence.' (*Id*. at p. 221.) 'It is irrelevant that a court might determine that evidence in the record tending to establish suitability for parole far outweighs evidence demonstrating  unsuitability for parole.' [Citation.] [¶] 'Any relevant evidence that supports the parole authority's determination is sufficient to satisfy the "some evidence" standard. [Citation.]' ([*Shaputis II,*] at p. 214, fn. omitted.) Moreover, a court's deferential 'some evidence' review is not limited to the evidence mentioned by the Board or the Governor. (*Id*. at p. 214, fn. 11.) 'Only when

4

the evidence reflecting the inmate's present risk to public safety leads to but one conclusion may a court overturn a contrary decision by the Board or the Governor. In that circumstance the denial of parole is arbitrary and capricious, and amounts to a denial of due process. [Citation.]" (*Id*. at p. 211, italics added.)" (*Stevenson, supra,* 213 Cal.App.4th at pp. 865-867.)

Later in its opinion, the Sixth District noted: "The Board could reasonably conclude that petitioner had not yet fully developed the insight and coping skills necessary to 'live in society without committing additional antisocial acts.' [Citation.] There was a rational nexus between the evidence and the panel's ultimate determination of current dangerousness; a modicum of evidence supports its decision to deny parole. This is not a case where a court is compelled to overturn the Board's decision because 'the evidence reflecting the inmate's present risk to public safety leads to but one conclusion' (*Shaputis II, supra,* 53 Cal.4th at p. 211), one contrary to the Board's decision. The 'some evidence' standard is satisfied." (*Stevenson, supra,* 213 Cal.App. 4th at pp. 870-871.)[3]

### B. *Petitioner's Lack of Insight*

Contrary to the majority, I believe there is substantial evidence in the record, indeed well more than the required "modicum of evidence," of petitioner's current "lack

---

[3] To me, one of the most interesting points of *Shaputis II* is the brief concurring opinion of Justice Chin. (See *Shaputis II, supra*, 53 Cal.4th at p. 221, conc. opn. of Chin, J.) There, Justice Chin stated: "I dissented in *In re Lawrence* (2008) 44 Cal.4th 1181 (*Lawrence*). I believed then, and still believe, the majority opinion in that case was ill considered. *Lawrence* is largely responsible for the confusion in the Courts of Appeal that today's opinion seeks to ameliorate. However, my view in *Lawrence* did not prevail, and I now accept the majority view. For this reason, I concur entirely in this case." I suggest this comment by Justice Chin is not only correct, but also makes clear that, as I said in a recent dissent, "the relevant universe has changed considerably since the issuance of" *Lawrence.* (*In re Young* (2012) 204 Cal.App.4th 288, 320, fn. 1.) And changed, of course, because of the unanimous opinion in *Shaputis II,* a decision which, I believe, renders *Lawrence* to no longer be, as the majority suggests, the "seminal decision" in this area of the law. (Maj. opn. at p. 31.) I suggest that description now belongs to *Shaputis II.*

of insight." In *Shaputis II*, our Supreme Court explicitly noted, toward the start of its discussion of "The Insight Factor," that recently "a great many parole denials have focused on the inmate's lack of insight" and that this factor has been noted by many recent Court of Appeal decisions. (*Shaputis II, supra*, 53 Cal.4th at p. 217.) And the court clearly thought that such was appropriate; it stated that its prior decisions "have expressly recognized that the presence or absence of insight is a significant factor in determining whether there is a 'rational nexus' between the inmate's dangerous past behavior and the threat the inmate currently poses to public safety. [Citations.]" (*Id.* at p. 218.) The court then added: "[I]t is noteworthy that lack of insight pertains to the inmate's current state of mind, unlike the circumstances of the commitment offense . . . . Therefore, the most recent evidence of the inmate's degree of insight will usually bear most closely on the parole determination . . . ." (*Id.* at pp. 219-220.)

I submit that petitioner's lack of insight into both why he murdered Michael Kane and attempted to murder the latter's mother, Mildred Irwin, on April 8, 1986, has been rather consistent since his commission of these acts. The Board remained concerned that he could not and did not explain why he attacked the two victims when he did, and thus lacked the required insight; it concluded that petitioner had "absolutely no understanding of how this life crime happened." I agree with the Board and, in so doing, specifically rely upon the following evidence in the record.

First, there was clearly some evidence in the record that petitioner has continued to minimize the violence involved in the crimes. In 2009, he told his psychological evaluator that he remembered telling Irwin that he wanted to talk with her, and then going out into a hallway where "[i]t seemed like somebody jumped on me full force from the back. It felt like that. Maybe [Kane] was trying to protect his mother, but I don't know. I don't remember anything else." But the following year, at the hearing, when asked what he recalled about the crimes, he replied: "I don't remember what happened" and "I don't recall what happened, actually." A few minutes later, petitioner told the Board it was "a mystery" to him why the crimes happened. Later in the hearing, when then

6

asked about his statement the previous year that someone had jumped on him "full force from the back," he replied that he had been "speculating."

All of this suggests continued confusion on the part of petitioner as to the reasons for his violent actions on the evening in question. Further, his willingness to "speculate" about what caused him to begin his murderous violence—and to do so without identifying it as "speculation"—constituted an implied justification for some if not all of his reaction, clearly constitutes "some evidence" that he continues to resist considering fully—and indeed does not now understand fully—why he acted as he did and to take full responsibility for his actions. It also supports the Board's concern about petitioner's versions of the events that led up to the violence and death.

Second, there was also clearly **"some evidence"** that petitioner was in denial regarding his violent tendencies toward Irwin, a matter of concern given the fact that he attempted to murder her when he killed her 17-year-old son, Michael Kane. In 2009, he told the evaluator that he had routine arguments in his relationships with women and, while conceding that he had indeed knocked down his second wife, denied that he had "ever hit a woman." This statement ignores three things: (1) his murderous conduct toward Irwin, who he shot at and struck with a gun on the night of the commitment offenses; (2) Irwin's 1987 report to the probation officer that petitioner had been violent toward her on the two previous separate occasions, the first time hitting her and the second time swinging at her; and (3) the probation officer's report that petitioner had attended an alcohol treatment program "after hitting victim Irwin during an alcohol blackout." Based on this evidence—almost all of it ignored by the majority—petitioner's 2009 denial that "he has ever hit a woman" was then, and remains now, "some evidence" of a lack of insight.

Third, the psychologist who evaluated petitioner in 2009 stated that he had "moderate insights" regarding his history of alcohol abuse—to be discussed further below—including his history of use of alcohol to relieve his emotional distress and the role his childhood traumas, i.e., the abuse he suffered from his older brother, played in his drinking and rage. However, that psychologist concluded that, while petitioner "has

7

gained insight into several of the factors that contributed to the offense, including his severe use of alcohol," he had "less insight into the reasons for his rage at the time of the offense."

Fourth, the Board's focus on petitioner's lack of insight was particularly appropriate in light of the significant danger involved in his consumption of alcohol. According to the 1987 evaluator, if petitioner were to drink, he could well engage in "almost automatic aggressive behavior" without the ability to exercise social judgment. Although there is some evidence, noted below, that petitioner had undertaken limited efforts to come to terms with his alcohol abuse, his limitations on those efforts suggest his further resistance to fully explore and resolve the reasons he acted as he did on the night of the murder and assault. As our Supreme Court noted in *Shaputis II*, "the inmate's insight into not just the commitment offense, but also his or her other antisocial behavior, is a proper consideration." (*Shaputis II, supra,* 53 Cal.4th at p. 219.)

I respectfully submit that all of these factors, especially when combined, undermine the majority's conclusion that "an inmate's lack of insight into the causes of his criminal conduct cannot rationally be inferred from his inability to remember the conduct where, as in this case, he acknowledges his factual, legal and moral responsibility for the criminal act and has expressed genuine remorse." (Maj. opn. at p. 36.)[4] This statement is, I submit, unjustified because, among other things, of (1) petitioner's initial recollection of someone "jumping on his back," (2) his subsequent suggestion that he was "speculating" regarding the reasons for his committing the murder and assault, and (3) his denial that he had ever "hit a woman." Even more unjustified is the majority's characterization of the Board's finding of petitioner's continuing lack of insight as "remarkable" and "irrational." (See maj. opn. at pp. 39, 40.) For all of the reasons set forth above, I submit that there is clearly "some evidence" supporting that finding.

---

[4] They also, I submit, render inappropriate the majority's characterization of the Board's attention to this issue as "relentless fixation." (Maj. opn. at p. 37.)

8

Rather than acknowledging that there is, indeed, a "modicum of evidence" supporting the Board's finding, the majority clearly reevaluates the evidence in the record and, based on that reevaluation, concludes that petitioner shows "suitability for release." (Maj. opn. at p. 27; see generally *id.* at pp. 27-30.) In this section of their opinion, the majority devotes considerable attention to "factors," "regulatory factors," and "suitability factors" the Board's decision "never considers," "ignores," or to which it shows "indifference." (Maj. opn. at pp. 29-33.) And it specifically acknowledges that it does so "to show the Board's failure to consider a substantial body of evidence in the record" showing petitioner's suitability "for release on parole." (Maj. opn. at pp. 31-33.)

I respectfully submit that this rather obvious reevaluation of the record before the Board is totally contrary not only to our Supreme Court's mandate of "the highly deferential 'some evidence' standard" of appellate review of Board decisions (*Shaputis II, supra,* at p. 221), but also to the recent decisions of our sister courts that have clearly understood that (1) it " 'is irrelevant that a court might determine that evidence in the record tending to establish suitability for parole far outweighs evidence demonstrating unsuitability for parole,' " and (2) the "decision of the Board or the Governor is upheld unless it is arbitrary or procedurally flawed." (*Stevenson, supra,* 213 Cal.App.4th at pp. 866, 868, quoting from, respectively, *In re Rosenkrantz* (2002) 29 Cal.4th 616, 677, and *Shaputis II, supra,* 53 Cal.4th at p. 221.)

### C. *The Issue of Petitioner's Alcohol Addiction*

As noted above, the fact that the record clearly establishes a lack of insight by petitioner of the reasons for his murdering of Kane and assaulting Irwin is not the only reason I dissent from the majority's opinion. I also have no difficulty in concluding that the Board's concern about petitioner's limited efforts to address his long-standing alcohol abuse problem was supported by "some evidence," indeed, again, much more than the "modicum of evidence" mandated by *Shaputis II*. Although much of the background regarding petitioner's alcohol addiction problem is discussed in the factual portion of the majority's opinion, it is mentioned only briefly in the substantive portion of that opinion. I frankly find this puzzling, because petitioner's failure to fully deal with his alcohol

9

addiction problem during his incarceration was clearly one of the bases for the Board's decision not to grant him parole.

Petitioner, relying on a variety of cases, argues that the Board improperly relied on its concern about his limited progress in Alcoholics Anonymous (AA), because rehabilitative programming is not significant unless evidence indicates a prisoner will remain dangerous in the absence of the programming. (See, e.g., *In re Ryner* (2011) 196 Cal.App.4th 533, 551 ["the significance of rehabilitative programming comes into play only when *after years of such programming* a prisoner is unable to gain insight into his antisocial behavior *despite* those years of therapy and rehabilitative programming"].) According to petitioner, his history of alcohol abuse does not render him currently dangerous in light of his alcohol-free, violence-free, and almost entirely discipline-free 24-year incarceration, as well as positive evaluation comments about his programming, impulse control, and lack of pro-criminal attitudes or values.

Petitioner argues there is "no evidence that completing only the first five steps of the 12-Step Program . . . made [petitioner] currently dangerous[]," particularly in light of his evaluators' findings about his low risk of dangerousness when sober. He also contends he presented convincing evidence that he effectively utilized the Native American Spiritual Circle as a sobriety program. Therefore, he contends, the Board's emphasis of the AA 12-step program was arbitrary and capricious, based on mere opinion and speculation, not evidence, and not a basis for finding parole unsuitability.

Petitioner's arguments are not persuasive in light of the circumstances of his case. In *In re Morganti* (2012) 204 Cal.App.4th 904, this court addressed the difficulties of evaluating the current dangerousness of a prisoner who, although presently sober, has a pre-incarceration history of substance abuse. We concluded that "[t]he risk a former drug or alcohol abuser will relapse, which can never be entirely eliminated, cannot of itself warrant the denial of parole, because if it did the mere fact an inmate was a former substance abuser would 'eternally provide adequate support for a decision that [he] is unsuitable for parole.' " (*Id.* at p. 921.) We held that "[t]he risk an inmate may fall back

10

into alcohol or drug abuse can justify denial of parole only where it is greater than that to which a former drug or alcohol abuser is normally exposed." (*Ibid.*)

I believe there is clearly "some evidence" that the risk petitioner could well revert to alcohol abuse upon release is greater than that to which a former alcohol abuser is normally exposed because of the severity of his problem with alcohol, his lack of insight into why he acted as he did (which we have already discussed), and his limited progress in coming to terms with alcohol abuse. Petitioner's arguments about AA versus his Native American Spiritual Circle miss the point. There is clearly "some evidence" to support the Board's concerns about his limited progress in AA, both because of (1) petitioner's own acknowledgment of its role in his recovery (he intends to continue with it, including after his release), and (2) his partial and limited involvement in both AA *and* the Native American Spiritual Circle.

The undisputed record indicates that, prior to the commitment offenses, petitioner persistently abused alcohol for decades, through divorces, lost jobs, completion of at least five treatment programs, his own leadership role in an alcohol treatment program's youth group, acts of violence, and his imminent breakup with Irwin before her mother's stroke. Furthermore, his alcohol abuse was directly associated with blackouts, during which he sometimes engaged in acts of violence without the ability to exercise customary social judgment, including the murder of Kane and attempted murder of Irwin. The Board could reasonably conclude that petitioner's risk of relapse into alcohol abuse was particularly dangerous, and could very well lead to further acts of violence that petitioner could not control.

Nonetheless, petitioner's recognition of his alcohol abuse and efforts to come to terms with it have been extremely slow. Despite his history and the role of alcohol in the commitment offenses, petitioner conceded that he did not understand that he suffered from alcoholism until 2002, notwithstanding the fact that he was imprisoned in 1987. Even then, he waited *four more years* before beginning participation in AA. And even after four years of participation, he has completed *only the first four steps of the 12-step program*. Thus, the Board had reason to be concerned that his work in AA, while

11

commendable, was not yet sufficient, particularly given (1) his long history of abuse and violence while under the influence of alcohol, (2) his multiple failed rehabilitation attempts, and (3) the key fact that he committed the murder and assault while, apparently, intoxicated. Which was why the psychologist who examined him a year before the hearing concluded that "[t]he primary concern continues to be the history of severe abuse of alcohol and the risk of relapse in the community." That "primary concern" is particularly pertinent here because, as noted above, of petitioner's only-partial participation in AA. But that primary concern and its bases are, unfortunately, simply not addressed or considered in the majority's opinion.

Petitioner contends that his participation in the Native American Spiritual Circle and related activities since 1995 is equivalent to his participation in AA. Although the record contains some support for the argument that the nature of the Spiritual Circle is such that it is equivalent to a sobriety program, there is also substantial evidence that petitioner's participation in it has not reduced the risk of his relapse upon release for at least two reasons.

First, although the record indicates petitioner began his participation in the Spiritual Circle in 1995, he dates his recognition of his alcoholism back to around 2002. This gap of approximately seven years suggests that, whatever the nature of the Spiritual Circle, it did not sufficiently focus his attention on his alcoholism for a long time, raising a legitimate question about its effectiveness as an equivalent to AA.

Second, petitioner told the Board that the Native American Spiritual Circle has four roads, but his statements to the Board emphasized only the road involving introspection, which he analogized to the first five steps of AA. This suggests that he has also made limited progress in the Spiritual Circle—even assuming it is the functional equivalent of AA.

In short, I conclude that "some evidence" supports the Board's denial of petitioner's parole because, specifically, of his clear failure to adequately address his alcohol abuse problem.

12

## D. *My Other Problems with the Majority's Opinion*

Finally, and in addition to the points made above regarding the "modicum of evidence" supporting the Board's decision, I respectfully submit that the majority's opinion ignores other realities in both the applicable law and the record in this case.

First of all, the majority repeatedly argues that there was insufficient evidence before the Board that was "rationally indicative of [petitioner's] current dangerousness." (Maj. opn. at p. 20; see also pp. 29, 30, 38.) I respectfully remind my colleagues of our Supreme Court's unanimous statements that: "The reviewing court does not ask whether the inmate is currently dangerous. That question is reserved for the executive branch. Rather, the court considers whether there is a rational nexus between the evidence and the ultimate determination of current dangerousness." (*Shaputis II, supra,* 53 Cal.4th p. 221.) I submit that the majority opinion does not do so.

Second, the majority states that "nothing in the record calls into question the authenticity of petitioner's lack of recall." (Maj. opn. at p. 37.) But there surely is: see (1) my discussion above regarding his statement regarding someone jumping on him "full force from the back," (2) his semi-retraction of the same as "speculation," and (3) his completely incorrect statement that he had never "hit a woman." (*Ante*, pp. 6-9.)

Third, as the Presiding Commissioner said in announcing the Board's decision in March 2010 after hearing the testimony of petitioner: " I know you say you don't remember, but if you don't remember, at least you should have some kind of understanding of how this happened, and you don't even have an understanding [of] how this crime happened. There was absolutely no understanding of how this life crime happened, and without you understanding how it happened, we don't understand how it could not happen in the future." With all due respect to my colleagues, they do not attempt to rebut this conclusion of the Board, a conclusion clearly supported by the psychologist's 2009 conclusion that petitioner had "less insight into the reasons for his rage at the time of the offense."

13

### E. *Conclusion*

I concur with the Attorney General that "Stoneroad's minimal participation in Alcoholics Anonymous—combined with his commitment offense and lack of insight into his crime—constitutes some evidence to support the Board's decision."  And this was written a month before our Supreme Court's decision in *Shaputis II*, a decision that substantially reinforces that conclusion.

Further, and as noted above, the majority's decision repeatedly cites evidence in the record, which it believes points in petitioner's favor, and asserts that the Board failed "to consider a substantial body of evidence in the record to that effect."  (Maj. opn., p. 31.)  But *Shaputis II* makes it abundantly clear that this is not at all the relevant standard of review.  That standard is "whether a modicum of evidence supports the parole suitability decision."  (*Shaputis II, supra,* 53 Cal.4th at p. 221.)  I submit that it clearly does here.

Finally, I conclude by quoting from our colleagues in the Sixth District in their recent opinion in *Stevenson*, an opinion that reflects that court's understanding of the significance of *Shaputis II* :  "We accept the majority's decision and our review in this case is governed by the court's opinion in *Shaputis II*.  (See *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 ['Courts exercising inferior jurisdiction must accept the law declared by courts of superior jurisdiction'].)"  (*Stevenson, supra,* 213 Cal.App.4th at p. 868.)

I respectfully submit that this court should do likewise.

_____
Haerle, J.

Trial Court:                      Humboldt County Superior Court

Trial Judge:                    Hon. Marilyn B. Miles

Attorney for Petitioner:      Susan L. Jordan
By Court Appointment Under the
First District Appellate Project

Attorneys for Respondent:    Kamala D. Harris, Attorney General
Jennifer A. Neill, Acting Sr. Asst. Atty, Gen.
Anya M. Binsacca, Supervising Deputy A.G.
Amber N. Wipfler, Deputy Attorney General